326 F.2d 172
 1 Empl. Prac. Dec. P 9686
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
MIRANDA FUEL CO., INC., Respondent. NATIONAL LABOR RELATIONS
BOARD, Petitioner, v. LOCAL 553, INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF
AMERICA, Respondent.
 No. 73, Docket 26232.
 United States Court of Appeals Second Circuit.
 Argued Oct. 21, 1963.
Decided Dec. 11, 1963.
 
 Melvin J. Welles, Attorney, National Labor Relatioins Board, Washington, D.C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Herman M. Levy, Attorney, National Labor Relations Board, Washington, D.C., on the brief), for petitioner.
 
 
 1
 Samuel J. Cohen, New York City (Jack Last and Cohen & Weiss, New York City, on the brief), for respondent Union.
 
 
 2
 Ruth Weyand, Washington, D.C., Melvin L. Wulf and David N. Ellenhorn, New York City, for American Civil Liberties Union as Amicus Curiae.
 
 
 3
 Thomas E. Harris, Associate General Counsel, AFL-CIO, Washington, D.C., for American Federatioin of Labor and Congress of Industrial Organizations as Amicus Curiae.
 
 
 4
 Robert L. Carter and Maria L. Marcus, New York City, for National Association for the Advancement of Colored People as Amicus Curiae.
 
 
 5
 Joseph L. Rauh, Jr., John Silard and Stephen I Schlossberg, Washington, D.C., and Benjamin Rubenstein, New York City, for United Automobile, Aerospace & Agricultural Implement Workers of America (AFL-CIO) as Amicus Curiae.
 
 
 6
 Before LUMBARD, Chief Judge, and MEDINA and FRIENDLY, Circuit Judges.
 
 
 7
 MEDINA, Circuit Judge.
 
 
 8
 This case was first before us in 1960, N.L.R.B. v. Miranda Fuel Co., 284 F.2d 861. We granted enforcement but not on the theory advanced by the Board, as will be more fully explained below. After the Union applied to the Supreme Court for certiorari that Court decided Local 357, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. N.L.R.B., 1961, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11. The Board thereupon requested that the proceedings theretofore had in Miranda be vacated and the case remanded to the Board. This was done, Local 553, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. N.L.R.B., 1961, 366 U.S. 763, 81 S.Ct. 1670, 6 L.Ed.2d 853.
 
 
 9
 We repeat the statement of facts from our former opinion, with certain additions. Lopuch's loss of seniority arose in the following manner. In April 1957, Lopuch had been employed as a truck driver by the Company, a seller of fuel oil, for approximately eight or nine years. He then enjoyed the eleventh position on a seniority list of approximately twenty-one. About the beginning of April 1957, Lopuch spoke to Jerry and Fred Miranda, chief officers of the Company, and told them he wished to spend the summer in Ohio and do some work for his sister-in-law, whose husband had just died. The period from April 15 to October 15 was a slack season in the fuel oil business, and was so designated in Section 8 of the collective bargaining agreement between the Union and the Company, quoted below. Lopuch obtained permission to leave at the close of business on Friday, April 12, 1957. He told his employers he would return by October 12. In mid-October, however, Lopuch became ill, and he did not return to work until October 30. The illness was evidenced by a doctor's certificate, and the late return was excused by the Company.
 
 
 10
 Shortly after his return, the Union, at the urging of various of its members, demanded that the Company reduce Lopuch to the foot of the seniority list, on the ground that his late return violated Section 8 of the collective bargaining agreement. The relevant portion of that Section provides:
 
 
 11
 'During the slack season, April 15 to October 15, any employee who according to seniority would not have steady employment shall be entitled to a leave of absence and maintain his full seniority rights during that period. Any man so described must report to the Shop Steward not later than 8 A.M. on October 15 and sign the seniority roster in order to protect his seniority, and the Employer agrees to accept the certification of said Shop Steward as to availability of such men when called by the Employer. If October 15 falls on Saturday or Sunday, the reporting day shall be the next work day. Any man failing to report as above specified shall forfeit all seniority rights.'
 
 
 12
 When the Union discovered that Lopuch's failure to return to work on time was because of an excused illness, it abandoned the claim that he be dropped from seniority because of a late return to work. Instead, it insisted that he be reduced in seniority because he had left work before April 15. Jerry Miranda, who did not think that Lopuch's early departure would cause any loss of seniority when he gave permission to leave on April 12, was reluctant to agree to this request. However, he acquiesced in the Union's demand that Lopuch be dropped to the botton of the seniority list.
 
 
 13
 Lopuch was a member of the Union, and there is nothing in the record that has been called to our attention to indicate that Lopuch had been disloyal to the Union, or had been guilty of any acts detrimental to the Union, or in any way transgressed the rules or policies of the Union. Nor is there anything to indicate he was regarded by the Union officials as a troublemaker.
 
 
 14
 While the strict legal construction of Section 8 of the collective bargaining agreement, as held by us on the prior appeal, 284 F.2d at page 863, required a forfeiture of seniority only for failure to return on time, the purpose of Section 8 was to eliminate fluctuations of seasonal employment.
 
 
 15
 Merely because the Union first relied upon Lopuch's late return, and then, after it was established that the late return was due to illness, placed its request for demotion upon Lopuch's early leaving, with the employer's consent, we are told by the Board that the demotion was due to 'whim or caprice,' that it constituted action by the Union, acquiesced in by the Company, that was 'hostile' and for 'irrelevant, unfair or invidious reasons,' and that it consequently was a breach of the duty of the Union to act fairly and impartially in its representative capacity under Section 9 of the Act. From this so-called 'unlawful discrimination' it is supposed to follow that Lopuch's rights under Section 7 were infringed. On the basis of this reasoning the Board concluded that the Union and the Company were respectively guilty of violations of Section 8(b)(1)(A) and (2) and Section 8(a)(1) and (3). The remedy applied was to restore Lopuch to his former position on the drivers' seniority roster, with back pay.
 
 
 16
 Thus the law question, lying at the heart of the case, is whether any sort of discrimination against an employee, affecting the terms and conditions of his employment, can constitute an unfair labor practice under Section 8, even if wholly unrelated to any union considerations.
 
 
 17
 We are assisted in our deliberations upon this case by very helpful and welldocumented briefs by the American Civil Liberties Union, the American Federation of Labor and Congress of Industrial Organizations, the National Association for the Advancement of Colored People, and the United Automobile, Aerospace & Agricultural Implement Workers of America (AFL-CIO), as amici curiae.
 
 
 18
 On the subject of fair and impartial representation the Board insists upon the per se approach. Like all cliches and short cuts in the law, designed to make life easy for the judicial officer who has to make the decision, this merely eliminates the thinking process necessary to get at the root of the matter. Did both the Union and the Company believe in good faith that Section 8 of the collective bargaining agreement, fairly interpreted, meant that an employee, who was entitled to a leave of absence between April 15 and October 15 to 'maintain his full seniority rights during that period,' forfeited such rights by taking a longer leave of absence? If so, it is difficult to perceive any 'discrimination' against Lopuch, as this interpretation, which seems to us far from unreasonable, particularly if made by laymen and not by lawyers, taking into consideration the purpose of said Section 8, applies equally to all employees, union and non-union alike. And yet there are no findings whatever on this subject in the record, either with respect to the Union or the Company, by the Trial Examiner or by the Board.
 
 
 19
 Thus, even if we were disposed to agree with the Board on the principal law question in the case, we would disagree with its conclusion that the Union, on the meager facts in the record, had taken against Lopuch 'hostile action, for irrelevant, unfair or invidious reasons,' and we would feel constrained to remand the case to the Board for the taking of further evidence that the making of additional findings of fact. In other words, having requested the Supreme Court to vacate the proceedings already had, and then having adopted an entirely new approach to the case on the basis of issues not previously litigated, the Board insisted upon pursuing its per se theory and took no further proofs but made a new decision on the basis of the old record. We cannot approve of this.
 
 
 20
 Further proceedings, however, will be wholly unnecessary if we adopt, as we shall, the view of the dissenting members of the Board to the effect that discrimination for reasons wholly unrelated to 'union membership, loyalty, the acknowledgment of union authority, or the performance of union obligations,' is not sufficient to support findings of violations of Sections 8(a)(3), 8(a)(1), 8(b)(2) and 8(b)(1)(A) of the Act, 29 U.S.C. 151 et seq., as amended. Accordingly, we turn to the discussion of the considerations affecting our decision of that controlling question of interpretation of the Act, and especially of Sections 7, 8 and 9, including the various subsections and subdivisions thereof.
 
 
 21
 The issue is indeed a narrow one. Section 7 describes the rights of employees 'to form, join, or assist labor organizations,' to bargain collectively, and to refrain from such activities, except when required to join a union by the terms of a lawful agreement. It is an unfair labor practice for an employer under Section 8(a)(1), and for a union under Section 8(b)(1), to interfere with the exercise by an employee of his Section 7 rights. It is also an unfair labor practice for an employer under Section 8(a)(3), and for a union under Section 8(b)(2), to discriminate 'in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization' or to cause such discrimination. Furthermore, subject to the provisions of Section 9(a), it is an unfair labor practice for an employer under Section 8(a)(5) and for a union under Section 8(b)(3) to refuse to bargain collectively.
 
 
 22
 As the various ways to discriminate against a person, or to be unfair or unjust to him, are legion, it would seem at first blush that the bearing of Sections 7 and 8 above described is intended to affect only union considerations. Another way of stating the same thing is to say that, to constitute an unfair labor practice under Section 8, the union or the employer must have committed some act the natural and foreseeable consequence of which is to be beneficial or detrimental to the union. The classic was of describing such effect in the typical case is to say that the act in question 'encouraged union membership as such.'
 
 
 23
 But here the placing of Lopuch at the bottom of the seniority list, even if done through sheer shim or caprice, and even if arbitrary, unjust and 'invidious,' whatever that may mean in the context of the facts of this case, could not conceivably have been thought to encourage union membership, because his demotion affected union and nonunion men alike. Indeed, the foreseeable effect, in the context of this case and the terms of Section 8 of the collective bargaining agreement, could only be 'to encourage timely return and continuous work until the annual layoff, the identical objective which prompted the contract provision,' as pointed out by the dissenting members of the Board.
 
 
 24
 Thus the Board on reconsideration of the case pursuant to the mandate of the Supreme Court conceived the ingenious, but as we think wholly erroneous theory that any sort of discrimination, unfairness or injustice to an employee, by the Union and acquiesced in by the employer, constituted a breach by the Union of the fiduciary duty implicit in Section 9 to represent the employee fairly, and an unfair labor practice by both the Union and the employer under Sections 8(a) (3), 8(a)(1), 8(b)(2), and 8(b)(1)(A). Accordingly, the single narrow question of law in the case boils down to whether it was the intent of the Congress to read into Section 7 and Section 8 the duty of fair representation implicit in Section 9.
 
 
 25
 We pause to observe that, against the background of the present nationwide interest in discrimination for reasons of race, nationality, color or religion, and the natural tendency of human beings to attribute their lack of success to discrimination of one kind or another against them, it seems inevitable that the Board would be inundated with charges of this character, were we to sustain the ruling of the Board in this case. The briefs of the NAACP and the Civil Liberties Union, as amici curiae, appear to assume that it is in the public interest to have such controversies channeled into the Board, where the remedy of reinstatement with back pay may be afforded, rather than leave them for decision by the courts. We are not so sure of this. See Cunningham v. Erie Railroad Company, 2 Cir., 1959, 266 F.2d 411. In any event, such matters of policy must be settled and determined by the Congress. In this case our task is not to fix policy but to interpret the statute and say what we think the Congress intended it to mean.
 
 
 26
 The decision of the Board in this case is the first and only one holding that discrimination, by way of unfair representation arising out of Section 9, constitutes a series of unfair labor practices under Section 8. We think a word or two on the subject of how the Board came to make such a ruling is appropriate by way of introduction to a discussion of the miscellaneous teachings of textwriters and the excerpts from numerous opinions of the courts that are relied upon by the parties and the amicicuriae curiae in their briefs.
 
 
 27
 When the case was last before us the Board took the view the Section 8 of the collective bargaining agreement vested in the Union exclusive control over the seniority status of the Company's drivers, and that this was a per se violation. We did not agree with this contention, N.L.R.B. v. Miranda Fuel Co., supra, 2 Cir., 1960, 284 F.2d 861, but held instead that the Union and the Company had violated the statute by reducing Lopuch's seniority without warrant for such action in the terms of Section 8 of the collective bargaining agreement, and that such reduction in seniority 'constituted a delegation of power over seniority rights which improperly encouraged union membership and discriminated against the employee Lopuch,' 284 F.2d at page 863. After the Union filed a petition for certiorari, the Supreme Court handed down its decision in Local 357, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. N.L.R.B., 1961, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11, discussed below. It is clear to us that this decision eliminated any probability that the Board's original per se theory would find favor with the Supreme Court. And so the Board requested the Supreme Court to vacate the proceedings already had and to remand the case to the Board. The Board, however, as we have said, was not interested in getting at the real reasons and motives of the parties in connection with Lopuch's demotion and the interpretation given by the parties to Section 8 of the collective bargaining contract. It was interested in establishing some sort of per se violations in this type of case. That is how the Board came up with the novel, if not quite revolutionary, theory that any 'hostile' action by a union against one of its members 'for irrelevant, unfair or invidious reasons,' in which action the employer acquiesces, and which 'adversely affects (the terms and conditions of employment,' constitutes a breach of the statutory duty of the union to be a fair and impartial representative, also 'restrains and coerces the affected employees in the exercise of their guaranteed Section 7 right to bargain collectively through their chosen agent' and thus violates Section 8(b)(1)(A) and Section 8(a)(1). Further ramifications of the theory need not be described. This is the gist of it. Were we to support the doctrine thus propounded the power and jurisdiction of the Board would be vastly extended and increased; and it would seem that such jurisdiction would be primary and the courts would be entirely excluded from the adjudication of such cases. That is what makes the case so interesting and important.
 
 
 28
 * Petitioner, in support of its order, relies upon numerous decisions stating in general terms the proposition that a union, as representative of a certain class or craft of workers owes those whom it represents a duty of fair representation. Most of these cases arose under the Railway Labor Act, 45 U.S.C. 151 et seq., as amended, and, consequently, could not and did not hold that a mere failure on the part of a union fairly to represent the workers constituted an unfair labor practice within the meaning of the National Labor Relations Act, in the absence of discrimination that encourages or discourages membership in a labor organization. Moreover, in the cases thus relied upon by the Board, the violation of the duty of fair representation was held to give rise to a remedy enforceable by the courts, specifically stated to be by way of injunctive relief or an award of damages. See, e.g., Steele v. Louisville & Nashville Railroad, 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; Tunstall v. Brotherhood of Locomotive Firemen, 1944, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187, Brotherhood of Railroad Trainmen v. Howard, 1952, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283; Ferro v. Railway Express Agency, 2 Cir., 1961, 296 F.2d 847; Thompson v. Brotherhood of Sleeping Car Porters, 4 Cir., 1963, 316 F.2d 191.
 
 
 29
 Turning to the NLRB cases relied upon by petitioner we find each of them distinguishable. For example, in Wallace Corporation v. N.L.R.B., 1944, 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216, decided before the 1947 Amendments to the NLRA and, therefore, raising different issues, the discrimination was plainly an unfair labor practice because based on prior affiliation with a particular union.
 
 
 30
 In international Union of Electrical Radio and Mach. Workers, AFL-CIO, Frigidaire, Local 801 v. N.L.R.B., 1962, 113 U.S.App.D.C. 342, 307 F.2d 679, cert. denied, 371 U.S. 936, 83 S.Ct. 307, 9 L.Ed.2d 270, an employee was discharged for failure to join a union as required by the collective bargaining agreement. The Act declares such discrimination to be an unfair labor practice, except in specified circumstances. The issue before the court was whether the exceptional circumstances were present, and resolution of this issue depended upon the narrow question of whether the union had fulfilled the obligations of fair dealing owed to an employee who had made a reasonable effort 'to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership' as provided in Sections 8(a)(3) and 8(b)(2).
 
 
 31
 Two textwriters give some support to petitioner's view. Professor Archibald Cox, now Solicitor General, expressed views in 1957, The Duty of Fair Representation, 2 Villanova L.Rev. 151, that seem to do little more than bring the pros and cons of the question to the attention of those interested in the subject, so the issue might not 'go by default unless pressed more vigorously upon an early occasion.' Professor Michael I. Sovern, in The National Labor Relations Act and Racial Discrimination, 1962, 62 Colum.L.Rev. 563, reasons to the effect that where the union causes the discharge of a non-union employee because he is a Negro 'the Negro workers are likely to assume that if they could only join the union, they would be allowed to work,' at page 570. See also pp. 587-9, 590-4, 608-13. Moreover, even if the principles supported in these Law Review articles were articulated in the same form as those expressed by petitioner in its decision in this case, they are contrary to the holdings of the adjudicated cases discussed below.
 
 
 32
 The Legislative History of the NLRA is not particularly illuminating on the issue before us. If anything the various expressions of Congressional intent would seem to indicate that the duty of the union to bargain as set forth in Section 8(b)(3) is merely the counterpart of the employer's duty to bargain, expressed in Section 8(a)(5), and does not in this context impose an additional duty of fair representation. Cf. 93 Cong.Rec. 4021 (1947), 2 NLRB, Leg. Hist.L.M.R.A., 1947 at 1025. Moreover, we think the remark of Congressman Hartley, 93 Cong.Rec. 3425 (1947), 1 NLRB, Leg.Hist.L.M.R.A., 1947 at 616, to the effect that Section 8(b)(3) requires the union to represent the workingman 'without discriminating against him for any reason, even if he is not a member of the union,' refers rather plainly to discrimination between members and non-members of the union.
 
 
 33
 We conclude that the authorities relied on by petitioner give little support for the novel principle sought to be established. The case against petitioner, however, is, we think impressive and all but compelling.
 
 II
 
 34
 To begin with, this case seems to be controlled by our recent decision in N.L.R.B. v. Local 294, International Brotherhood of Teamsters, 2 Cir., 1963, 317 F.2d 746, in which after examining the authorities, we concluded that:
 
 
 35
 'The union does not commit an unfair labor practice merely because it causes or attempts to cause an employer to promote or demote an employee or to discriminate for or against him. In Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), discrimination in seniority which was adopted at the behest of the union was found unexceptionable. In Aeronautical Industrial District Lodge 727 v. Campbell, 337 U.S. 521, 69 S.Ct. 1287, 93 L.Ed. 1513 (1949), the Court gave its approval to superseniority for union officials which was, of course, a practice proposed by the union. Local 357, International Brotherhood of Teamsters, etc. v. N.L.R.B., 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961), held that it was not an unfair labor practice for a union to cause to discharge of an employee because he was hired ahead of other men to whom the union has assigned preference. See also Alvado v. General Motors Corp., 303 F.2d 718 (2d Cir.), cert. denied, 371 U.S. 925, 83 S.Ct. 293, 9 L.Ed.2d 233 (1962).
 
 
 36
 'These authorities establish the principle that a union does not violate Section 8(b)(2) unless the discrimination which the union seeks would constitute a violation of Section 8(a)(3) if the employer acted without union suggestion or compulsion. Section 8(b)(2) is violated only by causing or attempting to cause 'an employer to discriminate against an employee in violation of (Section 8(a)(3))'. An employer who discriminates among employees does not violate Section 8(a)(3) unless the discrimination is based upon union membership or other union-connected activities. It is obvious, for example, that the employer's promotion or the demotion of an employee who is a union official is not a violation of the Act unless the discrimination for or against him is based on his union activity. It seems to us to be equally obvious that the union's seeking such a promotion or demotion would not constitute an unfair labor practice if the union's action was based upon the employee's merit or demerit and was unconnected with his union membership or activity.
 
 
 37
 'The conclusion of the Board that an employer commits an unfair labor practice if he changes an employee's conditions of employment at the instance of the union, is not only contrary to the letter and spirit of the Act and to the precedents, but Labor Relations Board, Washington, D.C. policy which is certain to have untoward consequences. There are countless situations in which the very concept of collective action demands that unions have the power to influence the employer to make changes in the job status of individual employees. To hold that unions cannot properly press upon an employer their demands for an employee's advancement or demotion would be to weaken greatly the union's effectiveness in representing all the employees in a unit. The policy of the Board is all the more mistaken if it is based upon disapproval for American Federation of Labor and instant case. Not only is the Board without authority to pass upon the wisdom or the desirability of a union's actions as long as those actions are not forbidden by the Act, but the principle applied by the Board would be equally applicable to actions which are clearly beneficial to the majority of employees. See Ford Motor Co. v. Huffman, and Aeronautical Industrial District Lodge 727 v. Campbell, supra.' (At 748, 749 and 751, of 317 F.2d.)We agree with the reasoning of the opinion just quoted.
 
 
 38
 Indeed, we do not see how any other view is compatible with the reasoning of the Supreme Court in Local 357, International Brotherhood of Teamsters Chauffeurs, Warehousemen and Helpers of America v. N.L.R.B., supra, 1961, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11, the case that led to the remand of Miranda to the Board for further proceedings. In effect the court there held that practically everything a union does encourages union membership, and that it is necessary in a particular case to show that the acts complained of were done with the unlawful intent and purpose of encouraging employees to join the union. It is not enough merely to show that the employer discriminated among employees at the behest of the union. An unfair labor practice has been committed only if the discrimination was deliberately designed to encourage membership in the union.
 
 
 39
 The result we thus reach is, we think, the only one consistent with the fundamental scheme of the Unfair Labor Practices portion of the National Labor Relations Act. This basic purpose, as we see it, relates to the interrelationship between employers and labor organizations on the one hand, and the interrelationship between labor organizations and union and non-union employees, on the other, all in a perfectly plain context of the effect of such interrelationships, and activities of one kind and another arising out of such interrelationships, on unions and on union membership. The machinery of the Board and the remedies applied in the enforcement of findings of unfair labor practices, as defined in the Act, are not suited to the task of deciding general questions of private wrongs, unrelated to union activities, suffered by employees as a result of tortious conduct by either employers or labor unions.
 
 
 40
 Enforcement denied.
 
 
 41
 LUMBARD, Chief Judge (concurring).
 
 
 42
 I concur in denying enforcement of the Board's order against the Miranda Fuel Company and Local 553.
 
 
 43
 Our decision in N.L.R.B. v. Local 294, International Brotherhood of Teamsters, 317 F.2d 746 (1963), sufficiently negates the Board's contention that union and employer activities of the type here involved-- wholly unrelated to the affected employee's relationship with the union-- constitute violations of sections 8(a)(3) and 8(b)(2).
 
 
 44
 However, I see no cause for the court even to consider the important and farreaching question raised by the Board whether action which violates a union's duty of fair representation may constitute an unfair labor practice in violation of section 8(b)(1). The evidence upon which the Board relies is insufficient to support its conclusion that the union took 'hostile action, for irrelevant, unfair or invidious reasons' against Lopuch. The Board adduced no evidence to suggest that the union acted, albeit in response to the demands of the other employees, otherwise than in a belief, honestly held, that Lopuch had lost his seniority under the collective bargaining agreement. Such conduct does not constitute a violation of the duty of fair representation implicit in section 9 of the Act.
 
 
 45
 There is no reason to remand the case to the Board for further findings of fact. The Board having had the opportunity to make a record which would substantiate its charges, the proper disposition of the case is simply to deny enforcement of the Board's order. Accordingly, I see no need to consider whether or not invidious discrimination by a union against one of its members would constitute an unfair labor practice.
 
 
 46
 FRIENDLY, Circuit Judge (dissenting).
 
 
 47
 Although there are several ways to approach this case, all of them, in my view, require us to sustain the Labor Board's finding against the union under 8(b)(2) and against the employer under 8(a)(3).[1] Since we had unanimously granted enforcement of this very order, 284 F.2d 861 (1960), and the precise issue here presented has not reached the Supreme Court, it would be reasonable to demand a pinpointing of what in that Court's decisions is now thought to demand a different result. Under a second approach we might ask whether, if a member aggrieved by arbitrary union action must first exhaust administrative remedies because trial of an action might turn up evidence that the discrimination against him was for infraction of a union 'rule' and thus would be 'arguably subject' to the Board's jurisdiction even on my brothers' reading of the statute, Local 100 of United Ass'n of Journeymen and Apprentices v. Borden, 373 U.S. 690, 695, 83 S.Ct. 1423, 10 L.Ed.2d 638 (1963); Local No. 207, International Ass'n of Bridge, Structural, and Ornamental Iron Workers Union v. Perko, 373 U.S. 701, 83 S.Ct. 1429, 10 L.Ed.2d 646 (1963),[2] it is really necessary that we prolong the exhaustion by sending the impecunious plaintiff back to the courts when the Board finds the union's action to have been wholly arbitrary. But I think it best in the first instance to heed the advice that 'to ascertain what Congress meant * * * we would do well to begin by carefuly attending to what Congress said.' Shapiro v. United States, 335 U.S. 1, 39, 68 S.Ct. 1375, 1395, 92 L.Ed. 1787 (1948) (Mr. Justice Frankfurter dissenting).
 
 
 48
 What the National Labor Relations Act makes an unfair labor practice is for an employer 'by discrimination in regard to hire or tenure of employment * * * to encourage or discourage membership in any labor organization,' 8(a)(3), and for a union 'to cause or attempt to cause an employer' to do so, 8(b)(2). Congress did not say 'to discriminate in regard to hire or tenure of employment because of membership in any labor organization,'-- language which, indeed, would not support the result here reached by the Board. Neither did it define the unfair labor practice as being discrimination 'in order to encourage or discourage membership in any labor organization.' What Congress forbade was 'to encourage or discourage membership in any labor organization' by 'discrimination in regard to hire or tenure of employment.'[3] Our task is to determine whether the Board's findings that the union's and Miranda's actions had done that were within the Board's power to make.
 
 
 49
 Although 'In common parlance, the word (to discriminate) means to distinguish or differentiate,' 365 U.S. at 689, 81 S.Ct. at 847, 6 L.Ed.2d 11 (dissenting opinion), it more often means, both in common and particularly in legal parlance, to distinguish or differentiate without sufficient reason. Compare United States v. Illinois Central R., 263 U.S. 515, 521, 44 S.Ct. 189, 68 L.Ed. 417 (1924). A teacher thus does not 'discriminate' simply by failing a student in an examination, although he would be doing so against his own judgment at outside dictation. This is a sufficient reason why, as said by Mr. Justice Harlan concurring in Local 357, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. N.L.R.B., 365 U.S. 667, 679, 81 S.Ct. 835, 842, 6 L.Ed.2d 11 (1961), 'an employer may discharge an employee because he is not performing his work adequately, whether or not the employee happens to be a union organizer'; the statement also rests soundly on the basis, evidently favored by Mr. Justice Harlan, that Congress did not mean 'discourage' to include the kind of discouragement there mentioned-- it had no interest in making labor organizations havens for the inefficient. See S.Rep.No.573, 74th Cong. 1st Sess. 11. For similar reasons, once the hiring hall agreement in the Local 357 case was pronounced valid, Slater's discharge for violating it was neither a 'discrimination' nor a forbidden 'encouragement.'
 
 
 50
 Our case is different. The union caused Miranda to 'discriminate' against Lopuch in regard to hire or tenure of employment, not simply in the broad sense of 'distinguishing' between Lopuch and his fellows but in the invidious sense of doing this without a proper basis. What the union did cannot be defended as enforcing a valid contract, as in the Local 357 case; its action, as we said three years ago, was 'against and not under the agreement.' 284 F.2d at 863. The Board was further warranted in finding that the union's act in compelling an unwilling employer to drop a valued employee of eight or nine years' standing to the lowest position on the seniority list because, with the employer's advance permission, he had gone off for the summer after finishing his work on a Friday night instead of waiting over for the following Monday, was not in good faith but rather was an arbitrary exercise of power.[4] We thus reach the issue whether the Board could lawfully conclude that demotion thus unjustifiably procured would 'encourage or discourage membership in any labor organization.'
 
 
 51
 Let us vary the instant case to the extent only of assuming that the contract had no union security clause and the victim was not a union member. If English words are to receive their ordinary meaning, I cannot see how it could fairly be denied in such a case that the employer's yielding to unwarranted demands by a union delegate or shop steward at the instance of union members would 'encourage * * * membership in any labor organization'; the non-members would think they had better get at least that much closer to the source of power. '* * * It is common experience that the desire of employees to unionize is raised or lowered by the advantages thought to be attained by such action.' Radio Officers' Union of Commercial Telegraphers Union, AFL v. N.L.R.B., 347 U.S. 17, 51, 74 S.Ct. 323, 341, 98 L.Ed. 455 (1954). If this be so, the argument against the Board's position must be that arbitrary union action causing an employer to discriminate against an employee is an unfair labor practice only when the victim is a non-member rather than a member or a 'bad' member rather than a 'good' member. Congress, it is said, imposed no liability on unions for applying power on employers to discriminate against members for no reason, although making unions liable when they did this, as in the Radio Officers case, 347 U.S. at 29-30, 74 S.Ct. at 329-330, 98 L.Ed. 455, for what they considered a good reason but proved to be a mistaken one.
 
 
 52
 Although that would seem curious legislation, we would have to apply it if it was what Congress enacted. But it is not-- my brothers' view is too myopic. The Board is entitled to look beyond the particular case, cf. Brooks v. N.L.R.B., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954); it may consider the effect which union power plays against members will have not only in union shops but in non-union shops. It could properly conclude that any such demonstration of union power to cause an employer to discriminate will lead non-members to become members in non-union shops, in the belief that by so doing they will eliminate at least one basis for a union delegate or shop steward causing the employer to take arbitrary action against them. As was said in the Radio Officers case, 347 U.S. at 51, 74 S.Ct. at 341, 98 L.Ed. 455, 'the Act does not require that the employees discriminated against be the ones encouraged for purposes of violations of 8(a)(3). Nor does the Act require that this change in employees' 'quantum of desire' to join a union have immediate manifestations.'
 
 
 53
 Even if the Board had been required to limit its consideration to 'encouragement' within the Miranda Fuel Company, it could fairly conclude that action like that of the union here might tend to cause union members to be 'good' members rather than 'bad, or indifferent members.' 347 U.S. at 40, 74 S.Ct. at 335, 98 L.Ed. 455. There is said to be no reason for members to decide they had better be 'good' members when they don't know that the reason why the victim was victimized was his being a bad one. But they also don't know that it wasn't. History teaches that it is precisely this kind of fear and uncertainty that encourages people to be servile to those who can wield arbitrary power. See Mr. Justice Douglas dissenting in United States v. Wunderlich, 342 U.S. 98, 101, 72 S.Ct. 154, 96 L.Ed. 113 (1951).
 
 
 54
 It must also be emphasized that the question is not whether we would think that to countenance the exercise of unrestrained union power to cause discrimination against a member would 'encourage' union membership but whether the Board might reasonably think so. As the Supreme Court said in the Radio Officers case, 347 U.S. at 51, 74 S.Ct. at 341, 98 L.Ed. 455, 'Encouragement and discouragement are 'subtle things' requiring 'a high degree of introspective perception.' Cf. N.L.R.B. v. Donnelly Garment Co., 330 U.S. 219, 231 (67 S.Ct. 756, 91 L.Ed. 854).' One of the main purposes for creating an agency like the Board 'is to have decisions based upon evidential facts under the particular statute made by experienced officials with an adequate appreciation of the complexities of the subject which is entrusted to their administration.' Republic Aviation Corp. v. N.L.R.B., 324 U.S. 793, 800, 65 S.Ct. 982, 986, 89 L.Ed. 1372 (1945). See also Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). The Board knows the facts of life in the labor world better than we ever can; we ought not upset its conclusion as to 'encouragement' unless we can say this is without rational basis. Compare United States v. Detroit and Cleveland Navigation Co., 326 U.S. 236, 241, 66 S.Ct. 75, 90 L.Ed. 38 (1945). If the Board had determined that the 'encouragement' to union membership afforded by arbitrary union action unrelated to infraction of union rules did not rise to the level required by the statute, we could not properly interfere. Neither may we do so when it has made the opposite determination.
 
 
 55
 No decision of the Supreme Court requires a contrary conclusion. It is true that in the cases of Boston and Fowler, dealt with in the Radio Officers opinion, 'The purposes of the unions in causing * * * discrimination clearly were to encourage members to perform obligations or supposed obligations of membership,' 347 U.S. at 52, 74 S.Ct. at 342, 98 L.Ed. 455-- the payment of dues in the absence of a valid union security agreement in Boston's case, adherence to what the union erroneously thought to be a hiring hall agreement in Fowler's. But there is no warrant for a view that by sustaining the Board's conclusion that enforcement of the union 'rules' there at issue would encourage union membership, the Court meant to preclude the Board from finding that arbitrary action by a union against a member might also do this. In addition to the passages of the opinion already quoted, there are the emphatic statements 'that specific evidence of intent to encourage or discourage is not an indispensable element of proof of violation of 8(a)(3)'; that 'an employer's protestation that he did not intend to encourage or discourage must be unavailing where a natural consequence of his action was such encouragement or discouragement'-- as in the case of enforcement of an invalid nosolicitation rule by an employer having no anti-union animus, Republic Aviation Corp. v. N.L.R.B., 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); that 'subjective evidence of employee response * * * is not required where encouragement or discouragement can be reasonably inferred from the nature of the discrimination'; that the Board can draw reasonable inferences; and, most significantly, that 'encouragement of union membership is obviously a natural and foreseeable consequence of any employer discrimination at the request of a union * * *' 347 U.S. at 44, 45, 48-51, 52, 74 S.Ct. at 338, 341, 342, 98 L.Ed. 455-- remembering also that 'the Act does not require that the employees discriminated against be the ones encouraged * * *' 347 U.S. at 51, 74 S.Ct. at 341, 98 L.Ed. 455. These were the principles which led us to grant enforcement of this very order three years ago.
 
 
 56
 The claim that all this was shattered by Local 357, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. N.L.R.B., 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961), rests upon what I consider a misreading of that case. The Board had there applied its ruling, laid down with retroactive effect in Mountain Pacific Chapter, 119 N.L.R.B. 883 (1958), that all union hiring hall agreements were per se discriminatory unless they contained certain prescribed provisions.[5] The sole issue was whether the very making of a hiring hall agreement that had not contained these provisions was a violation of the Act-- despite the inclusion of a nondiscriminatory clause, the obsence of evidence of actual discrimination against non-members, and the impossibility of having foreseen the requirements which the Board was to lay down. See Mr. Justice Harlan's concurring opinion, 365 U.S. at 677-678, 81 S.Ct. at 840-841, 6 L.Ed.2d 11. The plurality opinion, by Mr. Justice Douglas, concluded that since the legislative history demonstrated that Congress did not intend to outlaw the union hiring hall,[6] 'discrimination cannot be inferred from the face of the instrument when the instrument specifically provides that there will be no discrimination * * *,' 365 U.S. at 675, 81 S.Ct. at 839, 6 L.Ed.2d 11. The concurring opinion, by Mr. Justice Harlan, went on the ground 'that the Act was not intended to interfere significantly with those activities of employer and union which are justified by nondiscriminatory business purposes, or by nondiscriminatory attempts to benefit all the represented employees,' and that the Board had not found that the hiring hall 'clause was without substantial justification in terms of legitimate employer or union purposes.' 365 U.S. at 682, 684, 81 S.Ct. at 843, 6 L.Ed.2d 11. I see nothing in either opinion to support the view that the only 'discrimination' forbidden is between members and non-members, or between good members and bad members. Although discrimination of that sort would almost certainly encourage or discourage union membership, the opinions do not say these are the only kinds of discrimination which the Board may find will have that effect. The Local 357 decision did indeed validate our previous refusal in this case, 284 F.2d at 863, following Local 553, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. N.L.R.B., 266 F.2d 552 (2 Cir. 1959), to uphold the Board's ruling that union participation in the administration of seniority was per se unfair. But nothing in Local 357 indicates that the result there would have been the same if the union had caused Slater's discharge arbitrarily and without the protection of a valid hiring hall agreement.
 
 
 57
 My brothers rely heavily on N.L.R.B. v. Local 294, International Brotherhood of Teamsters, 317 F.2d 746 (2 Cir. 1963). The facts in that case were quite different. Monty, the employee there disfavored by the union's action, had no contractual right to priority over the two other extra drivers, and neither the intermediate report of the examiner nor the decision of the Board, 137 N.L.R.B. 1023 (1962), shows any reason save employer preference why he had been given first call. It may well be that union insistence on equitable work rotation when the contract is silent neither works a discrimination nor can be rationally found to encourage union membership; in any event that is a quite different issue from the one here. Compare N.L.R.B. v. Local 542, International Union of Operating Engineers, 255 F.2d 703, 705 (3 Cir. 1958). Moreover, the trial examiner in the Local 294 case had not considered the union's belief that Monty was 'no good' and 'a troublemaker' to be unreasonable, or its desire 'to keep this job open where a man out of work can pick up a few days' work now and then' to be specious, and this court found there was no evidence to support the Board's conclusion that the reason assigned by the union was a 'pretext.' 317 F.2d at 749 fn. 5. Thus the actual holding was simply that when a union induces an employer to make a non-discriminatory decision against an employee, it has not engaged in an unfair labor practice, 317 F.2d at 750. If the opinion was intended to go beyond that and to read the Local 357 decision as holding that arbitrary union action to force an employer to deal with a member as he could not properly do under the governing contract was necessarily outside the Act, I would be constrained rather to follow our previous decision in this case, which, as I see it, properly applied the statute as construed in Radio Officers and remains untouched by Local 357.[7]
 
 
 
 [1]
 Because of this I have no occasion to consider the Board's alternative ground of decision based on 8(a)(1) and (b)(1)
 
 
 [2]
 In the Perko case there was nothing to suggest infraction of any union 'rule' in the ordinary sense of that term; the union caused Perko to lose his job because he had taught members of another craft how to perform contested work. See also Barunica v. United Hatters, Cap and Millinery Workers, Local No. 55, 321 F.2d 764 (8 Cir. 1963), where the complaint alleged only a discriminatory nonreferral
 
 
 [3]
 The House Report on the Wagner Act said that 8(a)(3) outlawed discrimination 'which tends to 'encourage or discourage membership in any labor organization." H.R.Rep.No.1147, 74th Cong., 1st Sess. 21
 
 
 [4]
 I am unable to follow the criticisms of the Board's failure to take further evidence and make additional findings and of its allegedly not being interested in the real reasons and motives of the parties but rather in establishing a theory of per se violation. We held some years ago that the Board was warranted in finding this union's action to be 'in conflict with the agreement' and 'against and not under the agreement,' 284 F.2d at 863, and we referred to Lopuch as a 'victim.' Memorandum of Judges Swan and Clark, denying rehearing, dated December 27, 1960. The Board could scarcely have been expected to guess that factual findings which had previously proved so satisfactory to us would now cease to be; the remand requested from the Supreme Court was to enable the Board to consider whether the Local 357 case had established principles requiring a different result as a matter of law. If additional findings were needed, I am at a loss to understand why the Supplemental Decision's references to the Union as 'acceding to the unjustified pressures of some employees within the unit' and as having exercised 'an arbitrary power' do not fill the bill
 Neither do I understand how we can now say, contrary to our prior unanimous ruling, that these findings were not warranted by the evidence. As the Board held, 125 NLRB 454, 455-57 (1959), without disapproval by us, 284 F.2d at 862-863, 8 of the collective bargaining agreement did not apply to Lopuch at all. It concerned only an 'employee who according to seniority would not have steady employment' in the slack season; the undisputed testimony was that Lopuch would have had this. What the clause said in readily understandable English was that a driver whose position would give him only occasional work during the slack season did not have to hang around all summer in order to preserve his seniority, provided only that he got back in time; its purpose was to help junior workers, not to harm senior ones. Nothing gave the slightest warrant for supposing that it prevented the employer from treating an older employee like Lopuch as decent human relations dictated. Moreover, as we pointed out before, 284 F.2d at 863, the Draconian penalty of total forfeiture of seniority accrued over many years (as distinguished from possibly dropping a place or two in the list as a result of summer work by others) was hinged only to failure to report back promptly on October 15, a failure which the union admited was excused by Lopuch's illness. With this background the testimony amply supported the inference that the action of the union delegate and shop steward represented, not an honest though mistaken conviction as to the meaning of the contract, but rather a yielding to the demands of the other drivers that the union should use any pretext to advance them at Lopuch's expense. Such inference drawing is the Board's business-- not ours. Radio Officers' Union of Commercial Telegraphers Union, AFL v. N.L.R.B., 347 U.S. 17, 48-52, 74 S.Ct. 323, 98 L.Ed. 455 (1954). As I read the dissenting opinion of Chairman McCulloch and Member Fanning, 140 NLRB No. 7 (1962), they did not challenge the majority's finding of arbitrariness but disagreed on the ground that there was no 'legally tenable distinction,' fn. 28, between a case where a union demands a loss of seniority pursuant to a contract provision and another where arbitrary union action produces the same result.
 On the other hand, if the union was not acting arbitrarily against Lopuch but was creating a general rule that no member could leave before April 15 without forfeiting seniority, this would seem, as the majority of the Board suggested, to be a union 'rule'-- quite as much as the practice evidently considered to be one in Local No. 207, International Ass'n of Bridge, Structural and Ornamental Iron Workers Union v. Perko, supra, 373 U.S. at 707, 83 S.Ct. at 1432, 10 L.Ed.2d 646. See also Brunswick Corp., 135 NLRB 574 (1962).
 
 
 [5]
 The Ninth and Sixth Circuits had declined to recognize the Mountain Pacific rule, N.L.R.B. v. Mountain Pacific Chapter, 270 F.2d 425 (9 Cir., 1959); Morrison-Knudsen Co. v. N.L.R.B., 276 F.2d 63 (9 Cir. 1960), cert. denied, N.L.R.B. v. Hod Carriers, Bldg. and Common Laborers Union of America, 366 U.S. 910, 81 S.Ct. 1082, 6 L.Ed.2d 233 (1961); N.L.R.B. v. E. & B. Brewing Co., 276 F.2d 594 (6 Cir. 1960), cert. denied, 366 U.S. 908, 81 S.Ct. 1083, 6 L.Ed.2d 234 (1961). The First Circuit had upheld it, N.L.R.B. v. Local 176, United Brotherhood of Carpenters, 276 F.2d 583 (1960), as had the District of Columbia Circuit, 107 U.S.App.D.C. 188, 275 F.2d 646, in the decision under review
 
 
 [6]
 The opinion, 365 U.S. at 673, 81 S.Ct. at 838, 6 L.Ed.2d 11, quoted Senator Taft's explanation, 'In order to make clear the real intention of Congress, it should be clearly stated that the hiring hall is not necessarily illegal.' S.Rep. No. 1827, 81st Cong., 2d Sess., pp. 13, 14
 
 
 [7]
 I cannot share my brother Medina's qualms that sustaining the Board's ruling as to 8(a)(3) and (b)(2) will steer grievances of union members as to arbitrary union action away from the courts and toward the expert agency which Congress created to deal with labor matters. That would seem a rather good place for them to be. This is particularly so since the aggrieved employee's ability to proceed in court against the employer is seriously limited by the usual arbitration provisions which only the union can enforce, see Black-Clawson Co., Paper Mach. Division v. International Ass'n of Machinists, 313 F.2d 179 (2 Cir. 1962), and Belk v. Allied Aviation Service Co., 315 F.2d 513 (2 Cir. 1963), and particularly Judge Clark's concurring opinion, 315 F.2d at 517-518, and an action by him against either the employer or the union is likely to encounter the primary jurisdiction and 'arguably subject' doctrines so that he must make an excursion to the Board in any event. See note 2, supra, and the text to which it relates