BROOKS *v.* NATIONAL LABOR RELATIONS
BOARD.

No. 21.  Argued October 18, 1954.—Decided December 6, 1954.

*Erwin Lerten* argued the cause for petitioner. With him on the brief were *Frederick A. Potruch* and *Henry S. Fraser.*

*David P. Findling* argued the cause for respondent. With him on the brief were *Solicitor General Sobeloff, George J. Bott, Dominick L. Manoli, Fannie M. Boyls* and *William J. Avrutis.*

*Henry S. Fraser* filed a brief for the Genesee Foundry Co., Inc., as *amicus curiae,* urging reversal.

A brief of *amici curiae* urging affirmance was filed by *J. Albert Woll* and *Herbert S. Thatcher* for the American Federation of Labor, and *Arthur J. Goldberg* and *David E. Feller* for the Congress of Industrial Organizations.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The National Labor Relations Board conducted a representation election in petitioner's Chrysler-Plymouth agency on April 12, 1951. District Lodge No. 727, International Association of Machinists, won by a vote of eight to five, and the Labor Board certified it as the exclusive bargaining representative on April 20. A week after the election and the day before the certification, petitioner received a handwritten letter signed by nine of the 13 employees in the bargaining unit stating: "We, the undersigned majority of the employees . . . are not in favor of being represented by Union Local No. 727 as a bargaining agent."

Relying on this letter and the decision of the Court of Appeals for the Sixth Circuit in *Labor Board* v. *Vulcan Forging Co.,* 188 F. 2d 927, petitioner refused to bargain with the union. The Labor Board found, 98 N. L. R. B. 976, that petitioner had thereby committed an unfair labor practice in violation of §§ 8 (a)(1) and 8 (a)(5) of

the amended National Labor Relations Act, 61 Stat. 140–141, 29 U. S. C. §§ 158 (a)(1), (a)(5), and the Court of Appeals for the Ninth Circuit enforced the Board's order to bargain, 204 F. 2d 899.    In view of the conflict between the Circuits, we granted certiorari, 347 U. S. 916.

The issue before us is the duty of an employer toward a duly certified bargaining agent if, shortly after the election which resulted in the certification, the union has lost, without the employer's fault, a majority of the employees from its membership.

Under the original Wagner Act, the Labor Board was given the power to certify a union as the exclusive representative of the employees in a bargaining unit when it had determined, by election or "any other suitable method," that the union commanded majority support. § 9 (c), 49 Stat. 453.    In exercising this authority the Board evolved a number of working rules, of which the following are relevant to our purpose:

(a) A certification, if based on a Board-conducted election, must be honored for a "reasonable" period, ordinarily "one year," in the absence of "unusual circumstances." [1]

(b) "Unusual circumstances" were found in at least three situations: [2] (1) the certified union dissolved or became defunct; [3] (2) as a result of a schism, substantially all the members and officers of the certified union transferred their affiliation to a new local or international; [4]

---

[1] E. g., Kimberly-Clark Corp., 61 N. L. R. B. 90.    But see Trackson Co., 56 N. L. R. B. 917.

[2] The cases in which the Board found the "unusual circumstances" were all representation cases in which a rival union sought a new election less than a year after certification.

[3] Public Service Electric & Gas Co., 59 N. L. R. B. 325; cf. Nashville Bridge Co., 49 N. L. R. B. 629.

[4] Brightwater Paper Co., 54 N. L. R. B. 1102; Carson Pirie Scott & Co., 69 N. L. R. B. 935; cf. Great Lakes Carbon Corp., 44 N. L. R. B. 70.

(3) the size of the bargaining unit fluctuated radically within a short time.[5]

(c) Loss of majority support after the "reasonable" period could be questioned in two ways: (1) employer's refusal to bargain, or (2) petition by a rival union for a new election.[6]

(d) If the initial election resulted in a majority for "no union," the election—unlike a certification—did not bar a second election within a year.

The Board uniformly found an unfair labor practice where, during the so-called "certification year," an employer refused to bargain on the ground that the certified union no longer possessed a majority. While the courts in the main enforced the Board's decisions,[7] they did not commit themselves to one year as the determinate content of reasonableness. The Board and the courts proceeded along this line of reasoning:

(a) In the political and business spheres, the choice of the voters in an election binds them for a fixed time. This promotes a sense of responsibility in the electorate and needed coherence in administration. These considerations are equally relevant to healthy labor relations.

(b) Since an election is a solemn and costly occasion, conducted under safeguards to voluntary choice, revocation of authority should occur by a procedure no less solemn than that of the initial designation. A petition or a public meeting—in which those voting for and against unionism are disclosed to management, and in

---

[5] See *Westinghouse Electric & Mfg. Co.*, 38 N. L. R. B. 404, 409.

[6] In *Tabardrey Mfg. Co.*, 51 N. L. R. B. 246, the Board refused to conduct an election where there was no rival union and the employees were dissatisfied with their certified agent.

[7] *E. g., Labor Board* v. *Century Oxford Mfg. Corp.*, 140 F. 2d 541 (C. A. 2d Cir.) (six weeks); *Labor Board* v. *Botany Worsted Mills*, 133 F. 2d 876 (C. A. 3d Cir.) (repudiation one week after election, refusal to bargain three months after certification). Contra: *Labor Board* v. *Inter-City Advertising Co.*, 154 F. 2d 244 (C. A. 4th Cir.).

which the influences of mass psychology are present—
is not comparable to the privacy and independence of the
voting booth.

(c) A union should be given ample time for carrying
out its mandate on behalf of its members, and should not
be under exigent pressure to produce hothouse results or
be turned out.

(d) It is scarcely conducive to bargaining in good faith
for an employer to know that, if he dillydallies or subtly
undermines, union strength may erode and thereby re-
lieve him of his statutory duties at any time, while if he
works conscientiously toward agreement, the rank and
file may, at the last moment, repudiate their agent.

(e) In situations, not wholly rare, where unions are
competing, raiding and strife will be minimized if elec-
tions are not at the hazard of informal and short-term
recall.

Certain aspects of the Labor Board's representation
procedures came under scrutiny in the Congress that
enacted the Taft-Hartley Act in 1947, 61 Stat. 136. Con-
gress was mindful that, once employees had chosen a
union, they could not vote to revoke its authority and
refrain from union activities, while if they voted against
having a union in the first place, the union could begin at
once to agitate for a new election.[8]   The National Labor
Relations Act was amended to provide that (a) employees
could petition the Board for a decertification election, at
which they would have an opportunity to choose no

---

[8] Committee reports and controlling floor statements show an
awareness of the Board's prior practice but afford no guidance for
solution of our problem.   The Senate Report declared: "In order to
impress upon employees the solemnity of their choice, when the
Government goes to the expense of conducting a secret ballot, the
bill also provides that elections in any given unit may not be held
more frequently than once a year."   S. Rep. No. 105, 80th Cong.,
1st Sess. 12.   And further, "At present, if the union loses, it may
on presentation of additional membership cards secure another elec-

longer to be represented by a union, 61 Stat. 144, 29 U. S. C. § 159 (c)(1)(A)(ii); (b) an employer, if in doubt as to the majority claimed by a union without formal election or beset by the conflicting claims of rival unions, could likewise petition the Board for an election, 61 Stat. 144, 29 U. S. C. § 159 (c)(1)(B); (c) after a valid certification or decertification election had been conducted, the Board could not hold a second election in the same bargaining unit until a year had elapsed, 61 Stat. 144, 29 U. S. C. § 159 (c)(3); (d) Board certification could only be granted as the result of an election, 61 Stat. 144, 29 U. S. C. § 159 (c)(1), though an employer would presumably still be under a duty to bargain with an uncertified union that had a clear majority, see *Labor Board* v. *Kobritz,* 193 F. 2d 8 (C. A. 1st Cir.).

The Board continued to apply its "one-year certification" rule after the Taft-Hartley Act came into force,[9]

---

tion within a short time, but if it wins its majority cannot be challenged for a year." *Id.,* at 25.

And Senator Taft, the authoritative expounder of his measure, does not give us much more help: "The bill also provides that elections shall be held only once a year, so that there shall not be a constant stirring up of excitement by continual elections. The men choose a bargaining agent for 1 year. He remains the bargaining agent until the end of that year." 93 Cong. Rec. 3838.

The House decided to reverse the practice under the Wagner Act by inserting a provision which would have limited representation elections to 12-month intervals but permitted decertification elections at any time. It did so as an expression of the prevailing congressional mood to assure to workers freedom from union affiliation as well as the right to join one. This provision was rejected in Conference.

[9] *E. g., Globe Automatic Sprinkler Co.,* 95 N. L. R. B. 253; see *Celanese Corp. of America,* 95 N. L. R. B. 664, 672–674. Both before and after the Taft-Hartley Act, the Board and the courts did not apply the rule to a collective bargaining relationship established other than as the result of a certification election. *E. g., Joe Hearin,* 66 N. L. R. B. 1276 (card-check); *Labor Board* v. *Mayer,* 196 F. 2d 286 (C. A. 5th Cir.) (card-check); *Squirrel Brand Co.,* 104 N. L. R. B. 289 (order to bargain).

except that even "unusual circumstances" no longer left the Board free to order an election where one had taken place within the preceding 12 months.[10] Conflicting views became manifest in the Courts of Appeals when the Board sought to enforce orders based on refusal to bargain in violation of its rule. Some Circuits sanctioned the Board's position.[11] The Court of Appeals for the Sixth Circuit denied enforcement.[12] The Court of Appeals for the Third Circuit held that a "reasonable" period depended on the facts of the particular case.[13]

The issue is open here. No case touching the problem has directly presented it. In *Franks Bros. Co. v. Labor Board,* 321 U. S. 702, we held that where a union's majority was dissipated after an employer's unfair labor practice in refusing to bargain, the Board could appropriately find that such conduct had undermined the prestige of the union and require the employer to bargain with it for a reasonable period despite the loss of majority. And in *Labor Board v. Mexia Textile Mills, Inc.,* 339 U. S. 563, we held that a claim of an intervening loss of majority was no defense to a proceeding for enforcement of an order to cease and desist from certain unfair labor practices.

---

[10] For example, in *Swift & Co.,* 94 N. L. R. B. 917, the Board, while applying the exception to a schism that occurred within 7 months of certification, did not in fact direct an election until 17 months had passed. See also *Fedders-Quigan Corp.,* 88 N. L. R. B. 512.

[11] *E. g., Labor Board v. Brooks,* 204 F. 2d 899 (C. A. 9th Cir.); cf. *Labor Board v. Sanson Hosiery Mills, Inc.,* 195 F. 2d 350 (C. A. 5th Cir.); see *Labor Board v. Geraldine Novelty Co.,* 173 F. 2d 14, 16–17 (C. A. 2d Cir.).

[12] *Labor Board v. Vulcan Forging Co.,* 188 F. 2d 927 (five weeks); *Mid-Continent Petroleum Corp. v. Labor Board,* 204 F. 2d 613 (two months).

[13] *Labor Board v. Globe Automatic Sprinkler Co.,* 199 F. 2d 64 (refusal to bargain after 49 weeks not an unfair labor practice).

Petitioner contends that whenever an employer is presented with evidence that his employees have deserted their certified union, he may forthwith refuse to bargain. In effect, he seeks to vindicate the rights of his employees to select their bargaining representative. If the employees are dissatisfied with their chosen union, they may submit their own grievance to the Board.[14] If an employer has doubts about his duty to continue bargaining, it is his responsibility to petition the Board for relief, while continuing to bargain in good faith at least until the Board has given some indication that his claim has merit.[15] Although the Board may, if the facts warrant, revoke a certification or agree not to pursue a charge of an unfair labor practice, these are matters for the Board; they do not justify employer self-help or judicial intervention. The underlying purpose of this statute is industrial peace. To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to that end, it is inimical to it. Congress has devised a formal mode for selection and rejection of bargaining agents and has fixed the spacing of elections, with a view of furthering industrial stability and with due regard to administrative prudence.

We find wanting the arguments against these controlling considerations. In placing a nonconsenting minority under the bargaining responsibility of an agency selected by a majority of the workers, Congress has discarded common-law doctrines of agency. It is contended that since a bargaining agency may be ascertained by methods less formal than a supervised election, informal repudiation should also be sanctioned where decertification by another

[14] See *Hughes Tool Co.*, 104 N. L. R. B. 318; cf. *Labor Board* v. *Clarostat Mfg. Co.*, 216 F. 2d 525 (C. A. 1st Cir.).

[15] See *Henry Heide, Inc.*, 107 N. L. R. B., No. 258 (claim of loss of majority but no actual evidence); cf. *Borden Co.*, 108 N. L. R. B., No. 116; *Telegraph Publishing Co.*, 102 N. L. R. B. 1173.

election is precluded. This is to make situations that are different appear the same. Finally, it is not within the power of this Court to require the Board, as is suggested, to relieve a small employer, like the one involved in this case, of the duty that may be exacted from an enterprise with many employees.[16]

To be sure, what we have said has special pertinence only to the period during which a second election is impossible. But the Board's view that the one-year period should run from the date of certification rather than the date of election seems within the allowable area of the Board's discretion in carrying out congressional policy. See *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 192–197; *Labor Board* v. *Seven-Up Bottling Co.,* 344 U. S. 344. Otherwise, encouragement would be given to management or a rival union to delay certification by spurious objections to the conduct of an election and thereby diminish the duration of the duty to bargain. Furthermore, the Board has ruled that one year after certification the employer can ask for an election [17] or, if he has fair doubts about the union's continuing majority, he may refuse to bargain further with it.[18] This, too, is a matter appropriately determined by the Board's administrative authority.

We conclude that the judgment of the Court of Appeals enforcing the Board's order must be *Affirmed.*

[16] In *Wilson-Oldsmobile,* 110 N. L. R. B., No. 74, the Board has applied new jurisdictional yardsticks which would place this case, if now brought, outside them.

[17] See *Whitney's,* 81 N. L. R. B. 75; cf. *Ny-Lint Tool & Mfg. Co.,* 77 N. L. R. B. 642.

[18] *Celanese Corp. of America,* 95 N. L. R. B. 664. The Board has on several occasions intimated that even after the certification year has passed, the better practice is for an employer with doubts to keep bargaining and petition the Board for a new election or other relief. *Id.,* at 674; *United States Gypsum Co.,* 90 N. L. R. B. 964, 966–968; see also *J. P. O'Neil Lumber Co.,* 94 N. L. R..B. 1299.