**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GULFMONT HOTEL COMPANY, Respondent.**

No. 22340.

United States Court of Appeals Fifth Circuit.

June 24, 1966.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Theodore J. Martineau, Atty., N.L.R.B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Nancy M. Sherman, Atty., N.L.R.B., Washington, D. C., for petitioner.

H. L. Deakins, Jr., Houston, Tex., Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., of counsel, for appellee.

Before TUTTLE, Chief Judge, RIVES, Circuit Judge, and CHOATE, District Judge.

TUTTLE, Chief Judge:

This petition by the Board for enforcement of its order requiring good faith bargaining for a contract raises the single issue whether substantial evidence on the record as a whole supports the Board's determination that respondent's expressed doubt that the bargaining unit majority still wished to be represented by the local unions,[1] was not supported by a reasonable basis for doubting the unions' majority.

It is well settled that in the absence of special circumstances a union's majority status is irrebuttably presumed for a period of one year following the union's certification by the Board as collective bargaining agent. We think it is also true that upon the expiration of the certification year, the presumption of majority status continues but becomes rebuttable even in the absence of special circumstances. In the light of the Supreme Court's recognition in Brooks v. NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125, that the Board's policies with respect to the handling of decertification procedures are to be given great weight so long as they appear to be within the Congressional policy, and because of the Court's citation of Celanese Corporation of America, 95 NLRB 664, we think it can be fairly stated that any doubt as to the continuing majority status must rest on a reasonable basis and may not depend solely upon unfounded speculation or a subjective state of mind. See Laystrom Mfg. Co., 151 NLRB 144, Rev. 359 F.2d 799 (7 Cir.); NLRB v. International Furniture Co., 212 F.2d 431, 435 (5 Cir.). It is to be noted further that when the Board makes this determination it is not controlled, or even guided, by the later ascertained facts of union adherence and non-adherence. It is rather the question of fact whether the company had a reasonable basis at the time of its refusal to bargain for believing that majority support of the bargaining union no longer existed.

With these legal principles in mind, we consider the facts on which the Board here made its determination that the company's failure to continue bargaining amounted to an unfair labor practice. Both parties agree that there is no substantial dispute concerning the subsidiary facts in the case. The unions were certified on September 18, 1961. This followed from the election which showed that 111 members of the bargaining unit had voted in favor of the union and 106 against it. The unions and respondent negotiated during the following year, and on November 27, 1962, entered into a bargaining contract which was to be in effect from December 1, 1962, until December 1, 1963. This contract did not

---

1. This case presents an unusual situation where two separate unions had been certified by the Board as joint representative of the Hotel's employees.

contain an automatic renewal clause, but Section 32 thereof provided:

"Should either party desire to negotiate the terms of a new Agreement or modify the existing Agreement, the other party shall be notified of such desire at least 60 days prior to the termination date of this agreement. The parties agree to meet no later than thirty (30) days prior to the expiration date of this Agreement and hold meetings at reasonable times thereafter and endeavor in good faith to negotiate a new agreement."

On September 30, 1963, (61 days prior to the expiration date of the contract,) respondent delivered by messenger to the office of the unions a letter stating:

"In accordance with the provisions of Section 32 of the Agreement * * we hereby advise you that we desire to terminate this Agreement because we have a bona fide doubt that your Local Unions represent a majority of our employees in a unit appropriate for bargaining. For the foregoing reason, we are also precluded from negotiating and/or recognizing your Local Unions as exclusive bargaining representatives of our employees. * * * "

The trial examiner found that this letter was not seen by the unions' officials until after they had mailed to respondent, on October 1st, a letter in which they proposed a new agreement together with a request that the parties discuss terms and meet as provided for in the contract not later than 30 days before the expiration of the current contract.

On October 10th respondent replied to the unions' letter of October 1st, calling attention to their position previously taken that they doubted the existence of a majority in support of the unions. To this letter the unions responded by letter dated October 21st, stating, "The union carries 77 members on check-off * * * plus an excess number of members * * who are not on check-off." [2] They then reiterated a request for a bargaining conference. Respondent replied to this letter on October 25th, stating, "As our evidence establishes that your local unions do not represent a majority of the employees * * * and that your contention to the contrary is incorrect, we must decline to comply with your request for a meeting for the purpose of negotiating a new collective bargaining agreement." The letter went further and stated, "If you desire further evidence that a majority of the employees in the appropriate bargaining unit do not desire to be represented by your local union, you may desire to file a petition for an election with the National Labor Relations Board at any appropriate time."

Following receipt of this letter the unions filed an unfair labor practice charge with the Board on October 29th, and no further communications were had between the parties.

Of course, there is ordinarily no way in which the company can know with accuracy how many of its employees are members of the union which is the bargaining agent for them. Here the record is clear that the company did not know, at the beginning of the period, nor on

2. Section 29 of the contract provides as follows:
"Subject to the provisions hereof, the Employer agrees to deduct from the wages payable on the first pay date occurring in the month, the uniform affiliation fee, regular monthly dues, uniform assessments (if any) and reinstatement fee of all employees in the bargaining unit who are members of the Union and who individually and voluntarily certify in writing authorization for such deductions. The Union agrees to furnish the Employer authorizations duly signed by the employees so authorizing the deduction.

Such authorization may be revoked at any time by the employee by written notice to the Employer and the Union.
"The Union shall certify to the Employer in writing not later than the twenty-fifth (25th) day of each month a list of the employees who have made such assignment, together with an itemized statement of the dues to be deducted for such month from the wages payable on the first pay date of the employee in the following month. The Employer shall remit all sums so deducted in such manner to the Union."

September 30, 1963, from any documentary or other evidence, how many actual members there were in the unions. Following the authorization contained in Section 29 of the contract, the Unions notified the company during December, 1962, the first month of the contract, of the names of 77 persons who had authorized that their union dues be checked off by the company. The 77 names were supported by checkoff authorizations filed by the unions with the company. There is no evidence in the record to show how many were employed by the Company in the bargaining unit in December, 1962, at which time the 77 employees were listed on the checkoff list. No one knows how many employees who favored the unions had decided not to authorize the company to deduct union dues or how many who favored union bargaining were not even members of the unions.

The number of names submitted to the company of employees who had authorized a checkoff varied during the period of the contract up to the September 30th letter from a high of 77 in December, 1962, to a low of 69 in May of 1963 and back to 77 in September, 1963.

It is clear from the record that after the company received the authorizations, the auditor then struck the names of persons whose employment was terminated before the payroll date, or who had revoked their previous authorizations before that date. The figure remaining, as compiled from evidence submitted at the hearing, shows an equally consistent smaller number, varying from 70 in December, 1962, down to 64 in May, and back up to 71 in September for this purged list.[3]

The Board was warranted in finding that the principal source of the company's information as to union adherence or support for bargaining purposes (not necessarily union membership) was the monthly checkoff list furnished by the unions to the company, together with the monthly deletions from the list. It is not clear how much additional information Mr. Crooker, the non-managerial chairman of the board of the company,[4] had as to the course of terminations. However, he testified that he did not regularly familiarize himself with the withdrawals between his first inquiry made in January, 1963, of the first month's results and the September 30th date. He testified that in connection with the September 30th letter he made inquiries. He said:

"Q Not of your belief, but I mean did you have any personal knowledge of this fact? A Well, as we went into September, 1963—and I acquainted myself with facts in order to reach some conclusion in my own mind as to whether the union did or did not represent a majority of the people—I inquired about withdrawals from the union, terminations of employment and new cards, and reached the conclusion, based on the facts that I saw and learned, that the withdrawals and terminations exceeded the new membership but of course—

"Q When you said membership, you are referring to the check-off's? A Yes. I'm sorry. I wouldn't have

---

3. The company introduced evidence at the hearing to the effect that two additional names should have been deleted from the August, 1963 list, reducing the checkoff list submitted for September to 75 instead of 77, and the adjusted list to 69 instead of 71.

4. The chairman is an active lawyer who testified as to this company as follows:
"Q (By Mr. Deakins) Now, in your position as chairman of the board of the Gulfmont Hotel Company, do you have any supervision over the auditor's office? A I realize that ought to be a yes or no answer. But let me state that with

respect to the Ben Milam, I have spent more time on its affairs of all sorts than I have on the other hotels operated by Gulfmont Hotel Company; first, because it's in Houston and, therefore, it's easier to get to; and secondly, my family, in effect, owns the property, owns Block 51, and Gulfmont operates it under an operating agreement; whereas, that is not true with respect to the other Gulfmont hotels. So, as to the Ben Milam as distinguished from the others, I have injected myself into its operating affairs somewhat more than might normally be expected of a chairman of the board."

any way of knowing their membership —the new check-offs. But I believe there must have been, say—

"Q Well, I am not going to ask you what your belief is. A I shouldn't have stated it as belief. Based on the facts I saw with respect to these, I concluded that, say, there were three new cards coming in for every four dropping out, or thereabouts. My mathematics may be off some."

In point of fact, the new authorizations added monthly up until the checkoff list submitted on September 23rd, had kept the monthly list of authorized checkoffs practically constant. While there may have been two less persons properly on the September 23rd list than appeared thereon, there is no evidence that Mr. Crooker, or any other company representative, knew this when the letter of September 30th was written.

It is fairly plain that the company's conclusion that the majority support for the union was lacking was based on the knowledge that a larger number (exceeding by more than the 5 majority, by which the election had been won), had been struck from the checkoff list than had been added to it.

The flaw with the respondent's reasoning here is that there is no necessary connection between the checkoff list and the number of union supporters. There was no compulsory checkoff. (See footnote 1). The voters for the union numbered 111; the first checkoff contained only 77 names. The last checkoff list contains 77 names (probably correctible to 75). No one knows, or can fairly assume from the fact that many of the 111 had quit and many other persons had been hired how many employees of the unit supported the union on September 30, 1963.

■■ As we have stated initially, the presumption that the majority status continued placed the burden on the respondent to produce evidence that it had a good faith doubt that the union, in fact, no longer represented a majority of the employees. This burden was not met by a showing that more than five one-time union adherents had terminated their employment, or had instructed the company not to deduct their dues to the union. The record is utterly silent with respect to whether one or all or what percentage of the new employees were union adherents or were in favor of continued representation by the unit selected by the majority vote in 1962. In other words, comparison of the checkoff lists and a comparison of additions and subtractions from the list, in a legal sense, showed nothing with reference to what percentage of the 186 employees on September 30th still wished to have their bargaining unit represented by the unions. The effort by the company to challenge the unions' status by reliance upon such information therefore does not arise to the dignity of substantial evidence to justify a doubt of the continuing majority status.

The Order will be enforced.