**BALLY CASE AND COOLER, INC., OF DELAWARE, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**Local 2130, International Brotherhood of Electrical Workers, AFL-CIO, Intervenor.**

No. 18937.

United States Court of Appeals
Sixth Circuit.

Oct. 17, 1969.

Charles A. Kothe, Tulsa, Okl., for petitioner, C. A. Kothe, Kothe, Eagleton & Hall, Glenn R. Beustring, Jeff Nix, Tulsa, Okl., on brief.

Edward E. Wall, NLRB, Washington, D. C., for respondent. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Eugene B. Granof, Atty., NLRB, Washington, D. C., on brief.

Richard H. Markowitz, Philadelphia, Pa., for intervenor, Wilderman, Markowitz & Kirschner, Philadelphia, Pa., on brief.

Before O'SULLIVAN, McCREE, and COMBS, Circuit Judges.

COMBS, Circuit Judge.

This case presents the petition of Bally Case and Cooler, Inc., to review and set aside a decision and order of the National Labor Relations Board, reported at 172 N.L.R.B. No. 106, finding that the company had committed unfair labor practices in violation of 29 U.S.C. § 158(a)(1) and (5). The order directs the company to cease and desist from its unlawful activities, to bargain with the union upon request, and to post the usual notices. The Board has filed a cross-petition for enforcement; the union has been permitted to intervene in support of the Board's petition.

The company's principal office and plant is located in Bally, Pennsylvania, where it manufactures and distributes refrigerated food display cases. Following an election which the union won by a slim margin, the union was certified as the bargaining representative for a unit comprised of approximately 250 of the company's production and maintenance employees. An economic strike followed in June, 1963 but, after state court injunctive proceedings were instituted, most of the employees crossed the picket line and returned to work. The strike continued, however, until August 9, 1963, when a collective bargaining agreement was executed between the company and the union to remain in effect through August 8, 1966.

In early 1966, the union distributed circulars to the employees outlining its accomplishments and asking for financial support. Only a small, but relatively stable, percentage of the employees had been authorizing the company to withhold union dues from their pay checks. The highest number of authorized checkoffs was seventy-three in April, 1964, while the lowest number was forty-eight in June, 1965. On August 8, 1966, the date the contract expired, fifty-nine employees were authorizing checkoffs.

On May 11, 1966, the union notified the company that it desired to make al-

terations and amendments to the collective bargaining agreement then in force. The company responded by letter dated May 18, 1966, stating that "it is our good faith belief that your union does not in fact represent a majority of the employees in our plant." The letter then recited that the company wished to terminate the existing agreement and asked the union to agree to a consent election, stating that a representation petition would be filed "at the appropriate time." In conclusion, the company agreed to meet with the union and "discuss in good faith any subjects that you deem relevant. But at no time, in doing so, do we waive the position which we have taken in the face of the evidence of your lack of representation that is before us."

Collective bargaining sessions were held on June 17, July 1, July 28, July 29, and August 8, 1966. During this period, the company on several occasions reiterated its doubt as to the union's majority and asked the union to consent to an election. The union did agree to an election at the July 1 meeting, provided the company would include a union shop provision in a new contract if the union won the election.

The negotiations progressed until finally, at the July 28 session, the union offered to withdraw its non-economic demands except for a union shop provision and an improved management rights clause. On July 29, company spokesmen countered the union's offer of the previous day by presenting a written proposal setting forth increased economic benefits which the company was prepared to offer in a new contract. In response to questions propounded by union representatives, the company then first informed them that any agreement would be effective only on a week-to-week basis so that the new contract could not act as a bar to an election. The union membership later rejected this offer and authorized a strike. The parties agreed, however, to meet again on August 8. In the meantime, the union filed unfair labor practice charges against the company. A company attorney

testified that it was during this interim that he received a petition signed by seventy-five to eighty employees stating that they did not feel they should have to belong to a union to work at the company's plant.

At the meeting held on August 8, the union offered to drop all its demands and accept the proposal made by the company on July 29 if the company would agree to a one-year contract. The union also offered to withdraw the unfair labor practice charges which it had previously filed. The company took the position that it could then only execute an agreement on a day-to-day basis because it planned to file a representation petition the following day. The negotiations ended upon this note, and the company filed its representation petition on August 9.

On August 12, the assembled employees were told in a speech by a company attorney that the bargaining agreement had expired, but that the five cents per hour wage increase offered to the union on July 29 would nevertheless be put into effect. Then, on August 23, each employee received an additional twenty cents per hour wage increase and, on September 1, employees with fifteen years of service were given an additional week of paid vacation.

The Board, reversing the Trial Examiner's recommended dismissal of the complaint, found, on the basis of the factual situation outlined above, that the company had violated Section 8(a) (5) and (1) of the Act by (1) withdrawing recognition from the union in refusing to enter into a contract of a reasonable duration, and (2) unilaterally granting improvements in wages and other conditions of employment. The question raised here is whether these findings are supported by substantial evidence. We find that they are and therefore grant the Board's petition for enforcement.

■ Absent special circumstances, a union enjoys an irrebuttable presumption of majority status for one year after its

certification. Thereafter, the presumption is rebuttable, and an employer who has a reasonable basis in fact to doubt an incumbent union's majority status and who asserts that doubt in good faith may refuse to recognize and bargain with the union. N.L.R.B. v. Gulfmont Hotel Company, 362 F.2d 588 (5th Cir. 1966); Celanese Corp., 95 NLRB 664 (1951). See Brooks v. N.L.R.B., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954). The decisive issue here is whether the actions of the company were taken under a reasonably based doubt asserted in good faith. The Board concluded that, even if all the facts did disclose a sufficient basis upon which to doubt the union's majority, the company did not assert that doubt in good faith. In reaching that conclusion, the Board emphasized the company's delay in filing a representation petition and its conduct in unilaterally granting wage and vacation increases far in excess of what the union had been willing to accept.

[2, 3] It has been noted that, when an employer has doubt about the majority status of an incumbent union which has demanded bargaining for a new agreement, it is generally the better practice for the employer to petition the Board for a new election or other relief and to continue bargaining in good faith. Brooks v. N.L.R.B., 348 U.S. at 104, n. 18, 75 S.Ct. 176, 99 L.Ed. 125; United Aircraft Corp., et al. v. N.L.R.B., 416 F.2d 809 (D.C.Cir. 1969). Filing the representation petition promptly will foreclose the possibility of an employer using his "doubts" as a bargaining weapon in subsequent negotiations. The company's delay in filing a petition for an election would not per se support an inference of bad faith on the part of the

employer although it could serve as cumulative evidence of bad faith. Cf. N.L.R.B. v. Downtown Bakery Corp., 330 F.2d 921 (6th Cir. 1964).

Here, the Board relied on a combination of factors as evidence of the employer's bad faith. Although the company admittedly voiced its doubt of the union's majority on several occasions, it did not initially file a representation petition; instead it entered negotiations with the union without indicating that any negotiated contract would be subject to the outcome of a Board conducted election.[1] When the delay in filing the petition is viewed in conjunction with the company's failure to inform the union until late in the negotiations that an election was a condition precedent to the execution of a successfully negotiated contract, the record certainly suggests, if it does not command, the inference that the company's conduct in questioning the union's standing was actually directed toward extracting concessions from the union and casting it in a bad light. Compare Poray, Inc., 160 NLRB 697 (1966). Such an inference is reenforced by the fact that, immediately after the bargaining agreement had expired and the election petition had been filed, the company granted the five cents per hour wage increase which the union had previously approved. Shortly thereafter, vacation benefits and a wage increase were put into effect. This unexpected and, as far as this record shows, unprecedented benevolence by the company in bestowing these benefits so soon after filing the election petition does not strike one as entirely consistent with the company's position that it was at all times raising its doubt of the union's majority in order to afford its employees

1. The company's argument that it could not petition for an election until after the contract had expired is without merit. A careful reading of Board precedent clearly reveals that an election petition filed more than sixty but less than ninety days before the expiration date of an existing agreement will be timely. See Poray, Inc., 160 NLRB 697 (1966); Continental Can, 145 NLRB 1427 (1964);

General Cable, 139 NLRB 1123 (1962); Absorbent Cotton, 137 NLRB 908 (1962); Montgomery Ward & Co., 137 NLRB 346 (1962); Leonard Wholesale Meats, 136 NLRB 1000 (1962); Mueller Industries, 132 NLRB 469 (1961); Phillips Petroleum Co., 130 NLRB 895 (1961); Deluxe Metal Furniture Co., 121 NLRB 995 (1958).

an opportunity to freely express their choice in an election. The Board viewed this conduct not only as evidence of bad faith, but also as independently constituting a violation of Section 8(a) (5). Generally, such unilateral action by an employer in instituting changes in subjects of mandatory bargaining would violate Section 8(a) (5). N.L.R.B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed. 2d 230 (1962); Korn Industries Inc. v. N.L.R.B., 389 F.2d 117 (4th Cir. 1967). Of course, if the company's doubt was raised in good faith, it was under no duty to negotiate with the union and its unilateral action would not necessarily violate Section 8(a) (5). N.L.R.B. v. Downtown Bakery Corp., supra.

■ In any event, we are of the opinion that the Board could reasonably infer from this pattern of conduct that the company did not in good faith seek to test the union majority in a fair election, but rather sought to stifle the union.[2] The company contends that the increased benefits which it granted were economically justifiable and that similar changes had been made unilaterally under the management rights clause of the expired contract. However, since the undisputed facts relied on by the Board are open to conflicting inferences, we are not at liberty to draw an inference different from that drawn by the Board even though it may seem to us more plausible and reasonable to do so. N.L.R.B. v. H & H Plastics Manufacturing Co., 389 F.2d 678 (6th Cir. 1968). We conclude that the record contains substantial evidence on which to predicate a finding that the company did not enter-

tain a good faith doubt as to the union's majority. The Board, therefore, properly held the company's actions in withdrawing recognition from the union and in unilaterally changing conditions of employment to be in violation of Section 8(a) (5) and (1) of the Act.

The Board's cross-petition for enforcement of its order is granted.

2. The company's reliance on United Aircraft Corp., et al. v. N. L. R. B., 416 F.2d 809 (D.C.Cir. 1969), is misplaced. The factors relied on by that court in reversing the Board's finding of lack of good faith are not present here. For example, there, the company possessed written admissions by the union that it did not have a majority. Furthermore, the union had submitted demands which it recognized as obviously unacceptable whereas here it was the employer who interjected the proposal calculated to be

rejected by the union. The court also emphasized in United Aircraft that the Board found no independent unfair labor practices which were aimed at undermining the union. Here, the Board found that, irrespective of the good faith issue, the company's unilateral action in conferring economic benefits, subsequent to the filing of the election petition, constituted independent violations of Section 8(a) (1). N. L. R. B. v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964).