**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SAC CONSTRUCTION COMPANY, INC., Respondent.**

No. 78-2458.

United States Court of Appeals, Fifth Circuit.

Oct. 4, 1979.

Rehearing Denied Nov. 6, 1979.

Elliott Moore, Deputy Assoc. Gen. Counsel, Ruth E. Peters, Atty., N.L.R.B., Washington, D. C., for petitioner.

Muller, Mintz, Kornreich, Caldwell & Casey, P. A., Michael W. Casey, III, Herbert B. Mintz, Miami, Fla., for respondent.

Before BROWN, Chief Judge, CLARK and VANCE, Circuit Judges.

VANCE, Circuit Judge:

SAC Construction Company was a party to a labor contract executed between a multi-employer association and the union representing SAC's carpentry unit.[1] It was unable to operate profitably under the contract and timely withdrew from the multi-employer unit in December 1975 before the contract expired on March 31, 1976.[2] At the same time, SAC notified the union of its intention to negotiate a separate contract. The company did not hear anything from the union until March 29, 1976, when SAC President Stanley Cohen was apprised of a negotiation session on March 31. Although Cohen had a prior engagement on that date, he responded that he would be happy to meet with the union representative at the representative's convenience, and he actually held two such meetings during the month of April. On September 9, 1976,[3] Cohen was informed of a master agreement negotiated with the multi-employer unit and was sent a copy for approval.[4] On September 21, Cohen replied that the master agreement was unacceptable, adding that "[i]f you wish to negotiate with me I am available to meet with you at your convenience."

On or about April 1, 1976, SAC unilaterally reduced wage rates[5] and ceased fringe benefit plan contributions, both of which were mandatory bargaining subjects. These unilateral changes precipitated unfair labor practice charges against SAC, and the Board found the Company guilty of refusing to bargain. It ordered SAC to begin collective bargaining negotiations, to resume paying the wage rates and fringe benefit contributions in effect under the expired contract, and to make whole any employee loss suffered because of the unilateral changes. The Board now petitions this court to enforce its order, pursuant to 29 U.S.C. § 160(e). We deny enforcement.

An employer's duty to bargain with a union, whether it be a Board-certified union or simply an incumbent union, ceases when the employer can demonstrate a good faith belief that the union lacks majority status. *See NLRB v. Newspapers, Inc.,* 515 F.2d 334, 340–41 (5th Cir. 1975); *NLRB v. A. W. Thompson, Inc.,* 449 F.2d 1333, 1336 (5th Cir. 1971), *cert. denied,* 405 U.S. 1065, 92 S.Ct. 1497, 31 L.Ed.2d 795 (1972). The duty to refrain from making unilateral changes in those employment conditions subject to mandatory bargaining

---

1. The Administrative Law Judge found the following labor organizations to be involved in this dispute: the Broward County Carpenters District Council; the Palm Beach County Carpenters District Council and the Carpenters District Council of Miami, Florida and Vicinity.

2. The master agreement by its terms was effective from April 1, 1972, to March 31, 1975. A written extension of the master agreement between the unions and the employer association contained the effective dates from April 1, 1975, to March 31, 1976.

3. Cohen testified that he met with union officials on April 6 and 26, May 21, June 30 and July 1, 1976, and was told that the union would sign no contract other than the one negotiated with the multi-employer unit. Union officials denied the April 6 meeting and disavowed the statements attributed to them at the later meetings.

4. The new agreement contained a "most favored nations" clause that provided that, if the union subsequently negotiated more favorable terms with another employer, those terms would also benefit the signatory employers. Obviously, the union would be reluctant to negotiate a separate contract with another employer and, even if a new contract should be made, it would not agree to better terms than in the first contract.

5. The wage rates remained the same for the journeymen and apprentice carpenters who remained employed by SAC after March 31. The reduced wage rate was only applied to the new employees and to other classified employees who began doing some carpentry duties as the result of an overall employee declassification.

after termination of an existing contract derives from the employer's statutory duty to bargain collectively, because such changes are tantamount to a refusal to negotiate. *Hinson v. NLRB,* 428 F.2d 133, 137 (8th Cir. 1970); *see NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Under the same logic, the obligation to maintain existing conditions after contract expiration also ceases whenever the union has lost majority status.

█ The Board found that as of March 31, 1976,[6] the expiration date of the contract, a majority of unit employees voluntarily supported the union. It based its finding solely on the ground that on that date all employees in the recognized unit were paying union dues. Because there was no applicable union-security provision, such payment of union dues shows that a majority of the unit employees voluntarily supported the union at that time. *See NLRB v. Auto Ventshade, Inc.,* 276 F.2d 303, 307 (5th Cir. 1960).

█ Identification of the appropriate bargaining unit is necessary for determining majority status. The Board construed the appropriate unit as including not just employees formally classified as journeymen and apprentice carpenters, who were included in the unit before April 1, 1976, but also employees performing work within the union's trade jurisdiction.[7] We agree and accept the Board's construction. This finding is critical to the ultimate determination of majority status because, as of April 1, SAC has not utilized any job classifica-

tions.[8] Instead, its employees now perform all phases of the construction work, and consequently must be included in the appropriate unit for determining majority status.

█ While it is true that all six of SAC's carpenters were union members on March 31, only three of those employees continued to work for SAC after expiration of the contract on that date. The declassification of employees and the unilateral changes were not made until April 1, 1976. The Board erred in failing to determine majority status as of that date. Majority support is not a constant factor, and with it changes the duty to bargain. *Cf. Brooks v. NLRB,* 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954) (duty to bargain after loss of majority during one year period of Board certification).

In certain instances, a presumption of majority support can compel an employer to bargain collectively. *See NLRB v. Newspapers, Inc.,* 515 F.2d at 340. Whatever presumption[9] of continued majority support that existed in the instant case, however, was destroyed by the events occurring on April 1, 1976. On that date SAC abolished job classifications for its employees, who began performing all phases of construction work, including those duties previously performed by carpenters. Because of this abolition and the Board's correct determination of the appropriate unit, no majority status existed on April 1, 1976.

Mr. Cohen testified unequivocally and without contradiction concerning the makeup of SAC's employee complement as of April 1, 1976:

---

6. The Board's order reads March 31, 1977. We presume that this is a typographical error, because the union's status on that date is immaterial and a finding of majority status on that date is not supported by the record.

7. *SAC Constr. Co.,* 235 N.L.R.B. No. 171, slip op. at 2 n. 2 (Apr. 28, 1978).

8. Prior to March 31, 1976, SAC classified employees as laborers, operating engineers and ironworkers, along with journeymen and apprentice carpenters. The three former classifications had separate collective bargaining agreements with their respective unions, and these agreements also expired on March 31, 1976.

9. Respondent SAC argues that, because the contract involved here is a pre-hire agreement, there is no presumption of majority status under the doctrine of *Dee Cee Floor Covering,* 97 L.R.R.M. 1072, 1073 (1977). This argument ignores the 100 percent support of unit employees for the union as of March 31, 1976. Once majority support is gained, "the pre-hire agreement attains the status of a collective-bargaining agreement executed by the employer with a union representing a majority of the employees in the unit." *NLRB v. Local Union No. 103,* 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978).

Q. Okay.

Prior to the expiration of the latest agreement that you had with the tri-council, did any of these 20 that are now employed perform the same work for you at that time?

A. Yes, Ma'am.

Q. Okay.

Were they employed since you had previous agreements with laborers, carpenters, operating engineers and iron workers, of these 20 individuals that you now employ, did any of them fall within the trade jurisdiction of the Carpenters?

A. Yes, Ma'am.

Q. Okay.

Can you tell me how many of them?

A. If I understand the question, you're asking me how many men that are now on my pay roll were on the pay roll prior to April 1st of '76 and classified as carpenters?

Q. That's correct?

A. Two or three.

Q. Okay.

How many are employed that were previously classified as laborers?

A. Five. Approximately five.

Q. And these five are performing carpentry work at this time among their various duties?

A. Amongst other things.

Q. Okay.

Those individuals employed previously as operating engineers. How many of those remain on your pay roll?

A. None.

Q. What about iron workers? Do you have any employees previously classified as iron workers that are currently performing carpentry work?

A. No, Ma'am. I didn't have any iron workers immediately prior to the expiration. I haven't had iron workers for over a year.

Q. So the only classification of employees, pre-contract expiration which would be March 31st, 1976, that remained in your employ at this time are those employees that were previously classified as laborers and carpenters?

A. Yes, Ma'am.

On April 1, 1976, there were thus seven or eight employees in the appropriate unit. Only two or three were paying dues to the union. The remaining five were laborers who were affiliated with another union. Therefore, we cannot understand how the Board could conclude that a majority existed on April 1, 1976, and thereafter. Simple mathematics reveals the contrary: a majority of the employees in the unit were affiliated with a different union. The presumption of continued majority support is to be used as an aid in furthering the aims of collective bargaining, but will not be used to frustrate free choice and to produce the incongruous result found in this case. Enforcement of the Board's order is denied.

DENIED.