**NATIONAL LABOR RELATIONS BOARD, Petitioner, and,**

**Sheet Metal Workers' International Association of Northern Ohio, Local Union No. 33, Intervenor,**

v.

**SHAMY HEATING & AIR CONDITIONING, INC., Respondent.**

No. 00–1941.

United States Court of Appeals, Sixth Circuit.

April 4, 2002.

Before GUY and BOGGS, Circuit Judges; and CARR, District Judge.*

PER CURIAM.

The National Labor Relations Board ("NLRB") petitions this court to enforce its order requiring the respondent, Shamy Heating and Air Conditioning, Inc. ("Shamy"), to bargain with the intervener, Sheet Metal Workers' International Association of Northern Ohio Local Union No. 33 ("the Union"). The Union claims that it was chosen as the bargaining representative by a majority of Shamy's employees. The NLRB certified the election, but Shamy refused to bargain with the Union. Claiming that Shamy had engaged in an unfair labor practice by refusing to bargain, the Union sought relief from the NLRB. The NLRB held that Shamy had engaged in an unfair labor practice, ordered Shamy to bargain with the Union, and now applies to this court for enforcement of its order. Shamy argues that the NLRB's order should not be enforced because the election of the Union was invalid and because the bargaining unit has subsequently

shrunk so that the ordinary presumption of continuing majority support can no longer be entertained. For the following reasons, we enforce the NLRB's order.

## I

Shamy is a firm that installs and services hearing and air conditioning systems. In early 1999, Shamy had eleven employees who installed the systems. On April 26, 1999, the Union petitioned the NLRB to hold an election among Shamy's installation employees to become their bargaining representative. The NLRB approved the Union's petition and, after consultation with Shamy, an election plan. Pursuant to the plan, the NLRB conducted a secret-ballot election on June 11, 1999. All eleven employees cast ballots: six voted for representation by the Union, two voted against the Union. Three of the ballots were challenged for unspecified reasons and not counted. While it is not clear what vote was indicated by the uncounted ballots, it is clear that they would not have changed the outcome of the election.

On June 18, 1999, Shamy filed objections with the NLRB, claiming, among other things, that the Union had promised tangible benefits to employees in exchange for their votes for the Union. Specifically, Shamy alleged that the Union had promised its employees higher-paying positions with other Union shops if they remained with Shamy until the election and voted for Union representation. An NLRB-appointed hearing officer held a hearing on August 11, 1999.

Shamy presented fairly extensive circumstantial evidence of the job offers. On June 15, 1999, four days after the election, one employee quit Shamy to take a higher

---

* The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

paying position at another Union shop. On July 20, another five employees quit and were referred to other Union shops. At the hearing, the six employees who quit for other Union employment testified that they had voted for the Union, but denied that they were offered the positions before the election. Shamy presented some direct evidence of the offers, including testimony from Shamy's president, Mark Shamy, that one of the employees had admitted that he received the offer from the Union prior to the election.

The hearing officer found that the offers had not occurred and that the election results were valid. The NLRB adopted the findings of the hearing officer and certified the election on October 5, 1999.

In November 1999, the Union requested information from Shamy to initiate negotiations. Shamy refused, and the Union filed a charge with the NLRB, claiming that Shamy had engaged in an unfair labor practice by refusing to bargain with the Union. The General Counsel of the NLRB issued a complaint based on the Union's charge. In its defense to the General Counsel's complaint, Shamy contended that the NLRB had improperly certified the election because of the Union's illegal offers of specific performance in exchange for votes. To the extent that the election was valid, Shamy argued that the Union was no longer supported by a majority of the bargaining unit due to the resignation of more than half of the bargaining unit, particularly the employees who had voted for Union representation.

The General Counsel moved for summary judgment, and the NLRB granted the motion. The NLRB held that Shamy's arguments regarding the validity of the election either were decided or could have been raised in the election certification proceedings. *Shamy Heating and Air Conditioning, Inc.*, 331 NLRB No. 34,

2000 WL 718223 (2000). The NLRB also held that Shamy's new argument regarding the contraction of the bargaining unit could not be entertained in an unfair labor practice proceeding. *Ibid.* The NLRB ordered Shamy to provide the Union with the information validly requested and to bargain with the Union.

The NLRB now seeks to enforce its order in this court pursuant to 29 U.S.C. § 160(e).

## II

Shamy challenges whether the Union continues to have, and even whether it ever had, the support of the majority of Shamy's bargaining unit pursuant to a valid election. The procedural posture of this case highlights this court's unique relationship with the NLRB. Shamy's response to a petition to enforce the NLRB's order requiring Shamy to bargain permits this court to reach back and to review the NLRB's certification of the Union's election. Yet simultaneously, this court is barred from reviewing the NLRB's more immediate decision on the Union's continuing majority support as Shamy has raised the argument in the wrong proceeding. We consider Shamy's two arguments—that the Union's election was invalid and that the Union is no longer supported by a majority of the bargaining unit—separately below.

### A. The Union's Continuing Majority Support

We address first Shamy's chronologically later argument. Notwithstanding the validity of the June 1999 election, Shamy argues that it now has no duty to bargain with the Union because of the significant intervening contraction in the size of the bargaining unit. While the Union may have achieved a temporary majority in the election, Shamy argues, the employees

who had voted for union representation have now departed, leaving a shrunken work force that is likely not pro-union.

If a union wins an election to serve as representative for a bargaining unit, the union enjoys a legal presumption of majority support for one year. *Brooks v. NLRB*, 348 U.S. 96, 98, 75 S.Ct. 176, 99 L.Ed. 125 (1954). The presumption is in part an evidentiary shortcut and in part a behavior-shaping rule. As an evidentiary shortcut, the presumption reflects an empirical judgment that it is unlikely that the wishes of the bargaining unit have changed in a period of time shorter than a year. The existence of continuing majority support aside, the presumption is also designed to encourage employees to take the election seriously by making it binding for at least a year and to permit the Union a reasonable period of time to accomplish the bargaining unit's goals. *Id.* at 99 (noting that having an election bind the electorate for a fixed time "promotes a sense of responsibility in the electorate and needed coherence in administration.").

Nevertheless, the presumption can be rebutted by establishing certain "unusual circumstances." Among the circumstances that the Supreme Court has recognized as unusual is a "radical fluctuation" in the size of the bargaining unit. *Ibid.*

Shamy contends that the over-fifty-percent decrease in the size of the bargaining unit that elected the Union is such a radical fluctuation. In some sense, the large percentage change is a function of small size of the bargaining unit. Nevertheless, the combination of the percentage change with the closeness of the election and the testimonial evidence that it was indeed the departing employees who had voted for the Union might well incline us to the view that the empirical foundation beneath the one-year presumption was fundamentally undermined. *See, e.g., NLRB v. Washing-ton Manor, Inc.*, 519 F.2d 750, 753 (6th Cir.1975).

Shamy, however, has raised his argument in the wrong proceeding. The "unusual circumstances" exception to the one-year presumption of majority support cannot serve as a defense to an unfair labor practice complaint for refusing to bargain. Both this court and the Supreme Court has made clear that an employer's sole remedy to account for such unusual circumstances within the year after the election is petitioning the NLRB for a new election. *Brooks*, 348 U.S. at 103; *NLRB v. Action Automotive, Inc.*, 853 F.2d 433, 435 (6th Cir.1988). As the Supreme Court clearly explained in *Brooks*, "if an employer has doubts about his duty to continue bargaining, it is his responsibility to petition the Board for relief, while continuing to bargain in good faith at least until the Board has given some indication that his claim has merit.... [Unusual circumstances] do not justify employer self-help or judicial intervention." 348 U.S. at 103.

In this case, Shamy simply refused to bargain with the Union and raised his "unusual circumstances" as a defense in an unfair labor practice proceeding. The NLRB refused to consider the possible absence of continuing majority support as such a defense. It was not error for the NLRB to insist that Shamy raise his unusual circumstances arguments in a petition to the Board for a new election. The NLRB's procedural holding below on this issue was correct.

## B. The Validity of the Initial Election

In another odd procedural position is Shamy's argument that the employees' initial election of the Union was invalid. Shamy contends that the Union promised higher paying jobs at other Union shops to six employees if they would stay with Sha-

my until the election and would vote for Union representation.

Shamy raised its argument about the illegal inducements for votes as an objection to the certification of the election. An NLRB hearing officer conducted an evidentiary hearing on Shamy's objection, but determined that the Union did not make the offers alleged. The NLRB adopted the hearing officer's finding with regard to the absence of any such offers and certified the election results.

Shamy later refused to bargain with the Union, the General Counsel issued an unfair labor practice complaint, and Shamy raised the invalidity of the initial election as a defense. The NLRB held that all the issues that Shamy raised with regard to the election's validity "were or could have been litigated" in the certification proceeding. *Shamy Heating & Air Conditioning, Inc.*, 331 NLRB at 34. Accordingly, the NLRB determined that there was no reason to reexamine its certification of the Union's election. *Ibid.*

We cannot rely solely on the NLRB's determination as to the proceeding in which Shamy should have challenged the election's validity. In principle, one might infer from the NLRB's unwillingness to review its certification decision in the General Counsel's unfair labor practice action that Shamy should have appealed the certification decision to this court if it desired judicial review of the NLRB's holding on the validity of the election. The NLRB's decision to certify an election result, however, is not immediately appealable except in very narrow circumstances that do not obtain here. *Boire v. Greyhound Corp.*, 376 U.S. 473, 476–77, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); *NLRB v. Superior of Missouri, Inc.*, 233 F.3d 547, 550 (8th Cir. 2000). This is true even though no statutory provision expressly prohibits this court's consideration of a petition to review

an NLRB certification decision. *See, e.g.,* 29 U.S.C. § 160(e)-(f) (providing for petitions for review of any "final order" of the NLRB in circuit courts of appeals).

■ The election certification decision is not insulated from any judicial review simply because it is not immediately appealable. Instead, we review an NLRB election certification pursuant to a petition to enforce or to review an NLRB unfair labor practice order. *See, e.g., Health Care and Ret. Corp. of Am. v. NLRB*, 255 F.3d 276, 279–80 (6th Cir.2000) (reviewing the certification of an election after an employer refused to bargain); *NLRB v. Seawin*, 248 F.3d 551, 555–56 (6th Cir.2001). Accordingly, Shamy followed the proper method of seeking judicial review of the NLRB's election certification by refusing to bargain, waiting for the NLRB to bring an unfair labor practice charge, defending against the charge by claiming again that the certification of the election was erroneous, having the NLRB decide that it had engaged in an unfair labor practice by refusing to bargain and ordering it to bargain, and either filing a petition of review or opposing an NLRB petition to enforce its decision in this court. *See Boire*, 376 U.S. at 477 (explaining the potential for delayed review); *Superior of Missouri*, 233 F.3d at 550 (asserting its jurisdiction to review election certification order pursuant to an unfair labor practice charge); *ITT Lighting Fixtures v. NLRB*, 718 F.2d 201, 202 (2d Cir.1983). *See also* National Labor Relations Act § 9(d), *codified as* 29 U.S.C. § 159(d) (requiring that the NLRB supply a full record of the relevant election certification proceeding in judicial review of an unfair labor practice decision). Therefore, the question of whether the NLRB erred in certifying the election of the Union is properly before this court.

■ The pertinent proposition of law in this case is beyond dispute. If the offers

in question had occurred, the election would undoubtedly be invalid. The NLRB hearing officer expressed some doubt on this legal proposition. According to the hearing officer, the offers would not "constitute objectionable conduct" because the Union official would merely be promising "improved jobs" and had not explicitly conditioned the better jobs on Union membership. The NLRB declined to adopt, although did not dispute, the hearing officer's opinion on the legal irrelevance of the alleged offers because it adopted the hearing officer's finding that the offers did not occur. Decision and Certification of Representative at 1, n. 2, JA at 460. The hearing officer's reasoning, however, is wrong as a matter of law. A Union cannot promise positions or remuneration, *unrelated to improving working conditions at the employer*, in exchange for votes for the Union. This *quid pro quo* of offering narrow benefits to particular employees undermines the election process as much as handing the employee a bag of small, unmarked bills. Worse yet, the particular offers here, that the employees would be placed with other, presumably better, Union shops in exchange for their votes, shake the accountability on which the election system is premised. As we noted about the one-year presumption of majority support, NLRB election rules are designed so that the employee will cast a vote thoughtfully and be bound by it. The Union, by offering to whisk its supporters away from the bargaining unit if elected, would tend to render the employees unconcerned about casting a vote in the best interests of themselves as workers *vis a vis* the employer.

Both the Supreme Court and this court have held illegal pre-election offers to employees calculated to influence votes "without relation to the merits of the election." *Nestle Ice Cream Co. v. NLRB*, 46 F.3d 578, 583 (6th Cir.1995) (invalidating an election because the Union offered free legal services to employees, even without explicit agreement for vote); *NLRB v. Shrader's Inc.*, 928 F.2d 194 (6th Cir.1991) (invalidating an election because the Union gave hats and T-shirts to voting employees before the election); *NLRB v. Madisonville Concrete Co.*, 552 F.2d 168 (6th Cir. 1977) (invalidating an election because the Union paid a traffic ticket for a voting employee). *See also NLRB v. Savair Mfg. Co.*, 414 U.S. 270, 277, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973) (invalidating an election because the Union offered initiation fee waivers to those who promised in advance of the election to vote for the Union). Far worse than bribes, the Union allegedly offered in this case to place barely a majority of the bargaining unit in better-paying jobs elsewhere if and only if they voted for Union representation. This alleged conspiracy to fix the election in exchange for a better job elsewhere without question undermines the "fair and free choice" that the National Labor Relations Act seeks to insure through its election rules. *See* 29 U.S.C. § 159(a).

The hearing officer, however, determined that the alleged offers did not occur. This determination constitutes a finding of fact by the NLRB. We will defer to NLRB findings of fact if they are supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). In order to meet the "substantial evidence" requirement, we require more than a mere scintilla of evidence, but instead "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 368 (6th Cir.1993).

█ The circumstantial evidence in this case could make a trier of fact at least suspicious that the offers occurred. On June 15, 1999, only four days after the

successful election, Alan Worley quit to take a position with another Union shop. On July 20, 1999, five other employees quit for work at other Union shops. The last five employees did not announce their resignations in person. Instead, a Union representative visited Mark Shamy and explained that the five were resigning.

All of the six quitting employees testified at the certification hearing that they had voted for the Union. They also, however, all denied that the Union had offered them the positions before the election. Instead, all of them claimed that they were leaving because Shamy was not willing to bargain with the Union, or so it seemed from the fact that Shamy filed objections to the election. There is some temporal correspondence to Shamy's objections: it filed objections to the certification of the election on June 18, 1999, roughly one month before the block of five employees quit.

Shamy presented some direct evidence of the offers. Mark Shamy testified that Worley admitted to him that the Union offered him the job elsewhere before the election. At the hearing, Worley himself denied that he had received the offer from the Union in exchange for his vote and denied that he had told Mark Shamy anything to the contrary. Mark Shamy also testified that Dawn Morrison, the wife of Dave Morrison, one of the employees who quit, said that the Union had offered Dave another job with the Union in exchange for a vote.

The hearing officer held that he "believed" the testimony of the six employees that the Union had not offered them other jobs before the election and that "Shamy ha[d] twisted innocuous and ambiguous statements in an effort to support ... his conspiracy theory." JA at 377. Specifically characterizing these determinations as "credibility findings," the hearing officer decided that the offers had not occurred.

This court generally accords "considerable weight" to the credibility determination of the NLRB hearing officer, recognizing that it was the hearing officer who observed the demeanor of the witnesses. *NLRB v. General Fabrications Corp.*, 222 F.3d 218, 225 (6th Cir.2000). The hearing officer in this case appeared to decide that Shamy's testimony regarding the offers was self-serving and therefore not credible. In principle, the same could be said the employees' testimony. After all, their Union benefactors would not have been pleased if they had revealed the Union's election scheme.

Also in principle, the employees' departures in such proximity to the election would be hard to explain while denying the offers. Indeed, the rapidity with which the employees found new employment is nothing short of remarkable if they had not secured the positions before the election. The employees testified that Shamy's objections to the election motivated their departures, waiting only to secure new positions within a month before their resignations. The hearing officer explained this rapid employment based on testimony from Union officials that the market for heating and air conditioning installers was very tight at the time of the employees' departures so that a typical search period for installers looking for new work would be very short. The hearing officer again found the Union official's testimony credible.

The hearing officer had evidence on which he could rest his ruling. In the end, the circumstances surrounding the departures are not enough to prove the existence of the offers. The hearing officer discredited all the direct evidence that Shamy offered. We have no basis on

which to revisit the hearing officer's credibility determinations.

Aside from arguing that the NLRB's finding that the offers had not occurred was unsupported by substantial evidence, Shamy contends that the hearing officer, and the NLRB by adoption, committed several procedural errors in reaching a determination. First, Shamy contends that the hearing officer improperly revoked the subpoena that it had issued to Dawn Morrison. Specifically, Shamy argues that the hearing officer lacked authority to revoke the subpoena because the regional director of the NLRB, in ordering the hearing, had already granted the subpoena. Shamy, however, raised this particular objection to the hearing officer's recommendation in the NLRB's certification proceedings. The NLRB did not find the hearing officer's revocation of the subpoena as beyond his authority. We leave the allocation of decisionmaking authority within the NLRB to the NLRB itself, and defer to its resolution of this issue.

■ More substantively, Shamy also argues that the hearing officer, and the NLRB through its certification, denied Shamy the opportunity to present relevant and admissible evidence by not enforcing the subpoena. We generally review NLRB decisions regarding the admissibility of evidence, but only for an abuse of discretion. The hearing officer, however, determined not that Dawn Morrison's testimony was inadmissible, rather merely that he would not delay or extend the hearing in order to secure Morrison's appearance. Indeed, the hearing officer claimed that he would consider Shamy's proffer regarding what would be the content of her testimony, if compelled to testify. According to the proffer, Shamy intended to question Dawn Morrison regarding certain statements that Dave Morri-

son had made about his motivations for quitting. The hearing officer held the content of the proffer, as hearsay, would simply be too unreliable to make a difference even if fully validated by Morrison's actual testimony. We cannot say that the hearing officer's weighing of the costs of delay in actually enforcing the subpoena and the benefits of Morrison's testimony was an abuse of discretion.

■ Second, Shamy contends that the hearing officer should not have permitted any of the employees to testify at the hearing because the Union had violated the hearing officer's sequestration order. Specifically, Union officials discussed some of the testimony occurring inside the hearing with witnesses who were yet to testify. Additionally, the Union allegedly "prepared" the six employees to testify on the day before the hearing. The hearing officer determined that the discussion in violation of the sequestration order did not seriously undermine the witnesses' credibility and that there was no evidence that Union officials told the witnesses to do anything more than tell the truth. To the extent that the Union's conduct violated the sequestration order, the law governing NLRB evidentiary hearings does not require the remedy of striking the witnesses' testimony. The hearing officer did not abuse his discretion in refusing to strike the witnesses' testimony.

Because the NLRB's determination through the recommendation of its hearing officer that the alleged offers of alternative employment did not occur is supported by substantial evidence and its procedural rulings were not beyond its discretion, we affirm the NLRB's certification of the Union's initial election.

### III

As Shamy has not sustained any issue on which we can invalidate the NLRB's

finding of an unfair labor practice, we EN-FORCE the NLRB's order that Shamy bargain with the Union.