**BELLWOOD GENERAL HOSPITAL, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 79–1818.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 28, 1980.

Decided Aug. 11, 1980.

---

4. The word "order" was used in lieu of "decision" in the January 11, 1978, decision in Docket No. AB–1 (Sub–No. 53).

David L. Cohen, Marina Del Rey, Cal., for petitioner.

Christopher Katzenbach, NLRB, Washington, D. C., for respondent.

Before PELL, BAUER and CUDAHY, Circuit Judges.

PELL, Circuit Judge.

This case is before the court on the petition of Bellwood General Hospital, Inc. (Hospital) for review of an order of the National Labor Relations Board and the Board's cross-application for enforcement of that order. The Board's order, 243 NLRB 23 (1979), required collective bargaining with Bellwood Registered Nurses Association, United Nurses' Association of California (BRNA–UNAC or Union). The Board found that the Hospital had failed to establish adequately its good faith doubt of the previously certified union majority status.

The factual circumstances surrounding the alleged failure to bargain and consequently found unfair labor practice are not in dispute.

BRNA–UNAC was certified to represent the registered nurses employed at the Hospital after a Board election held on July 30, 1976. UNAC is the parent association of the affiliate BRNA. Extended negotiations (46 meetings) followed the certification and a contract was signed in November of 1977 which covered a term from October 1, 1977 to April 30, 1978 with economic benefits retroactive to May 1, 1977. During these negotiations, the Union was represented by Kathy Jiannino, president of UNAC, Thomas Robertson, executive administrator of UNAC who acted as chief negotiator for the Union, Betty Timmins, president of BRNA, and four registered nurses employed by the Hospital, Anna Gallizio, Joan Enkhorn, Joan Johnston, and Cheri McGowan. The Hospital was represented by Raymond Bohard, an outside labor relations consultant.

Shortly after the execution of the first contract, Robertson contacted Bohard concerning the Hospital's failure to pay certain of the retroactive economic benefits. Apparently this difficulty was settled between the parties. Soon thereafter, Timmins, Gallizio, and Enkhorn all left the employment of the Hospital. On January 4, 1977, Bohard requested Robertson to furnish, as required under the contract, a list of the union members employed at the Hospital. Robertson never responded to this letter, apparently in retaliation for the Hospital's earlier failure to give certain requested information to Robertson. No charge, however, was filed concerning these alleged contract violations.

On January 27, 1978, the Hospital notified the Union, as required by the contract, of its intention to terminate the agreement upon its expiration on April 30th. On January 28, the Union responded by expressing the desire to commence bargaining for a successor agreement. Prior to any meeting concerning the second contract, however, the Hospital, on February 23, 1978, filed a

petition with the Board's regional office requesting a new election and alleging that the Union no longer represented a majority of the registered nurses. The petition was dismissed by the Regional Director on grounds of timeliness and the merits of the petition were never reached.[1]

On March 7, 1978, Jiannino sent a letter to all Hospital nurses for whom the Union had addresses calling for a meeting on March 15 to discuss the upcoming contract negotiations. Only two nurses attended the meeting, including the nurse in whose home the meeting was held, although two additional nurses spoke with Jiannino by telephone. It was approximately at this time, apparently, that Esperenza Kroll, BRNA's elected treasurer, told the Hospital's personnel director that she was considering resigning because of the nurses' lack of interest in the Union. At the meeting of the nurses she had called, Jiannino appointed nurses McGowan and Johnston to act as "interim" secretary and treasurer of BRNA, respectively, although the record indicates there was no established procedure or contract authority for these "appointments." A president was not appointed to replace Timmins.

The parties held the first negotiating meeting regarding the successor contract on April 13, 1978. Only Robertson and Jiannino were present to represent the Union because neither McGowan nor Johnston, the only remaining employed members of the original negotiating team, wished to have their work schedules changed so as to attend the meetings. At the start of the meeting, Bohard gave a letter to Robertson stating:

> Bellwood General Hospital, Incorporated has a good faith doubt that the Bellwood Registered Nurses Association or the United Nurses Associations of California, nor any other organization, is the designated bargaining representative for the Hospital's Registered Nurses in an appropriate bargaining unit as defined in the National Labor Relations Act.

Until the issues raised herein are resolved to the Hospital's satisfaction, the Hospital reserves the right to withdraw from any negotiations, should it be established that the Union(s) are no longer the authorized bargaining representative for the Registered Nurses at the Hospital.

> However, the Hospital is agreeable to meet at mutually agreeable times and places in order to comply with any bargaining obligation which may exist.

The meeting continued and concluded with the scheduling of a second meeting on April 24 and the submission by the Union of various contract proposals.

At the April 24 meeting, the Hospital submitted various counter-proposals to the Union including a proposal that the wages of the nurses be increased by 6.5% instead of the Union's requested 11%. Regarding this proposal, Robertson testified, "I told him it was not responsive to our proposal, and that I would get back to him and we would consider it." A third meeting was then scheduled for May 19, 1978.

On April 23, the day before the second meeting, Kroll officially resigned as a member of BRNA and in a letter to the Hospital's personnel office stated, "There has been no representation for Bellwood General Hospital for the past several months now." Another nurse, Margaret Benton, conveyed a similar sentiment to the personnel director.

Under date of April 28, 1978, Jiannino called a second meeting of the Bellwood nurses to discuss the contract negotiations and ask for suggestions. In the letter inviting the nurses to the meeting, Jiannino noted that since the date of the election, the turnover of nurses at the Hospital had been approximately 70% and that "practically all of the [BRNA] officers and representatives have terminated rather than accept the Bellwood environment." The letter continued:

---

1. The petition was dismissed because it was not filed within the "open period" provided by the Board's "contract-bar" rules, with regard to "health care institutions," *i. e.,* 90–120 days prior to the expiration of the existing contract. *See Trinity Lutheran Hospital,* 218 NLRB 199 (1975). The dismissal of this petition is not an issue on this appeal.

. . . UNAC is not a typical labor organization. UNAC is a program for, and an assistance to, Registered Nurses in the operation and maintenance of their *own* labor organization. Bellwood Registered Nurses Association is such a device. But in fact, the RN's are doing nothing for themselves, and consequently, management seems to be prevailing by osmosis.

Only one employee, McGowan, attended the meeting and she indicated to Robertson that the Union "had no support" at the Hospital. Information about the poor attendance at the meeting, Kroll's resignation and remarks, Benton's and McGowan's sentiments and the poor attendance at the prior Union meeting were conveyed to Bohard.

On May 18, 1979, the Hospital cancelled the scheduled May 19 meeting by telegram to the Union and asserted its "good faith doubt" of the Union's majority status. This telegram was the last communication between the parties but was not the basis of the Board's order. Rather, the Board held that the Hospital effectively withdrew recognition from the Union on April 13 and at that time did not possess sufficient objective evidence to support its alleged "good faith doubt."

An employer's refusal to bargain with an established union can be justified on at least two grounds: 1) that the union no longer represents a majority of the employees (to bargain with a minority union is, in fact, a violation of the Labor Relations Act, 29 U.S.C. §§ 158(a)(2), (a)(3), *NLRB v. Hi-Temp*, 503 F.2d 583 (7th Cir. 1974)); or 2) that the employer possesses a "good faith doubt" that the Union continued to represent a majority of the employees. *Orion Corp. v. NLRB*, 515 F.2d 81 (7th Cir. 1975). Though the Hospital in this case, by alleging that the Union was "defunct," has attempted to justify its failure to bargain on both grounds, we see no reason to discuss the applicability of the first justification in light of our disposition of the issues regarding the second.

A claim of "good faith doubt" must satisfy an objective test although subjective evidence may be used to bolster the employer's argument. *Orion, supra* at 85. The standard is "whether there is sufficient evidence to cast serious doubt on the Union's majority." *NLRB v. Tahoe Nugget, Inc.*, 584 F.2d 293, 297 n.13 (9th Cir. 1978), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289 (1979). "[G]ood faith is demonstrated when the employer is aware of facts manifesting lack of Union support and employer misconduct did not contribute to the loss of support." *Id.* at 300. The evidence supporting the good faith doubt must be clear, cogent, and convincing. *Orion, supra* at 85.

The Board utilizes various presumptions when determining whether to issue bargaining orders in the present situation. For example, during the initial year of certification, there is ordinarily an irrebuttable presumption of continued union majority status. *Brooks v. NLRB*, 348 U.S. 96, 98, 75 S.Ct. 176, 178, 99 L.Ed. 125 (1954); *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 279 n.3, 92 S.Ct. 1571, 1577 n.3, 32 L.Ed.2d 61 (1972). A similar presumption applies during the term of a collective bargaining agreement. *Pioneer Inn Associates v. NLRB*, 578 F.2d 835, 838 (9th Cir. 1978). Following the expiration of these periods of time, the presumption becomes rebuttable and can be defeated by the employer's establishing either of the two previously mentioned justifications, *Zim's Foodliner, Inc. v. NLRB*, 495 F.2d 1131, 1139 (7th Cir. 1974), *cert. denied*, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65. The applicability of the presumption operating during the term of the agreement is crucial in the present case because if the Board is correct in determining that the Hospital's withdrawal of recognition of the Union was a "functional reality" on April 13, 1978, the presumption would operate to defeat the Hospital's claimed justification regardless of the amount of favorable evidence it submitted. It is clear to us, however, that the Board lacked substantial evidence supporting this determination.

The Hospital's letter given to Robertson on April 13 explicitly stated that the Hospital's withdrawal was conditional upon stated future events: "*Until* the issues raised herein are resolved . . . , the Hospital reserves the right *to* withdraw . . . *should it be established* that the Union(s) are no longer the authorized bargaining representative. . . ." (Emphasis added.) The circumstances surrounding and occurring after the April 13 meeting also indicate a conclusion other than the Board's. For example, contrary to any effective decision to withdraw, the Hospital engaged in later negotiations and, in fact, submitted counter-proposals at the meeting on April 24. There is no reasonable basis for inferring that these counter-proposals were so unreasonable as to indicate bad faith bargaining. Furthermore, Robertson apparently did not believe that the Hospital had withdrawn because he agreed to and attended the April 23 meeting and at that time indicated his anticipation of even further negotiations.

The Board relies upon the fact that the Hospital refused at the April 13 meeting to furnish to the Union a list of employees and their addresses as evidence of the withdrawal of recognition. There was no charge filed concerning this refusal and although it may have been improper or in violation of the contract, it is clear that it was not done as a consequence of a refusal to bargain, but in retaliation for the Union's prior refusal to furnish the Hospital with a list of its members. Similarly, we do not attach significant weight to the fact that the Hospital, in its affirmative generalized admission of eight paragraphs of the General Counsel's complaint, "admitted" the allegation that it refused to bargain "on or about" April 13. We note in this regard that in the original charge filed with the Board by the Union, the Union alleged only the Hospital's refusal to bargain on May 18. Neither fact, we believe, amounts to "substantial evidence" of the actual date of the refusal.

Lastly, we disagree with the Board's contention made at oral argument that the Hospital's April 13 letter so chilled the bargaining atmosphere that future good faith bargaining was impossible. Robertson's actions after the meeting clearly indicate otherwise and there was no evidence submitted suggesting that the Hospital's expressed belief was communicated to the rank-and-file members of the Unions.[2] In sum, there is no substantial evidence that the Hospital withdrew recognition or refused to bargain on April 13, or at any other time during the term of the agreement which terminated on April 30, 1978. We, therefore, review the Hospital's evidence offered to support its alleged good faith doubt. *Zim's Foodliner, Inc., supra.*

The Board, in its argument that the evidence confronting the Hospital was inadequate to justify a good faith doubt, relies upon a series of cases stating that the individual elements the Hospital relies upon, standing alone, are insufficient. *E. g., NLRB v. Vegas Vic,* 546 F.2d 828 (9th Cir. 1976), *cert. denied,* 434 U.S. 818, 98 S.Ct. 57, 54 L.Ed.2d 74; *Retired Persons Pharmacy v. NLRB,* 519 F.2d 486 (2d Cir. 1975); *Orion, supra,* (degree of union membership and isolated complaints by employees about union activities are not necessarily indicative of the degree of union support); *NLRB v. Sure-Tan, Inc.,* 583 F.2d 355 (7th Cir. 1978); *Zim's Foodliner, Inc., supra,* (large turnover alone is insufficient supporting evidence of good faith doubt); *NLRB v. Gulfmont Hotel Co.,* 362 F.2d 588 (5th Cir. 1966) (no necessary connection between number of employees on checkoff list and number of employees supporting the union). However, in doing so, the Board ignores the fact that Bohard and the Hospital had the sum total of many factors before them indicating a loss of the Union's majority status. These factors did, indeed, include the 70% turnover rate and statements by employees concerning their dissat-

---

**2.** Nor do we believe that the Hospital's petition for a new election filed in February illicitly "chilled" the bargaining atmosphere.

isfaction with the Union and the loss of Union support. However, the evidence also incorporated the lack of properly elected Union officers, the extremely low attendance at Union meetings, the failure of McGowan and Johnston to join the negotiations for the second contract, the lack of any grievance activity during the first contract term, the lack of the appointment of Union stewards or representatives, the lack of any Union visits to the Hospital or of any use of the Union bulletin board, and the statements made by Jiannino in her letter of April 28. Case law establishes that it is the cumulative effect of all the evidence presented to the employer which is the relevant consideration, not each element considered separately. *Ingress-Plastene, Inc. v. NLRB*, 430 F.2d 542, 547 (7th Cir. 1970); *Tahoe Nugget, Inc., supra* at 305; *Star Mfg. Co. Div. of Star Forge Inc. v. NLRB*, 536 F.2d 1192 (7th Cir. 1976); *National Cash Register Inc. v. NLRB*, 494 F.2d 189 (8th Cir. 1974); *Convair Div. of General Dynamics Corp.*, 169 NLRB 131, 134 (1968). Even were we to agree, therefore, that some of the individual elements might not, in themselves, justify a good faith doubt, or even that the sum total of the evidence might not support a finding that the Union had, in fact, lost its majority status, *see Hershey Chocolate Corp.*, 121 NLRB 901 (1958), we think the record without reasonable dispute indicates that the Hospital had sufficient objective evidence before it on which to base a reasonable doubt of the Union's continued majority support. The Hospital's presentation was sufficient, at least, to shift the burden to the General Counsel to establish the Union's majority. *Orion, supra* at 85. The General Counsel made no such showing.

Though prior case holdings on the issue of the employer's mental state, based as they must be upon the facts before the court, are not controlling, we find substantial support for our holding today in *Star Mfg. Co., supra,* and *Ingress-Plastene, supra.*[3]

In *Star,* this court found sufficient support for the employer's claim of good faith doubt in the cumulative effect of evidence showing that only a small percentage of employees were members of the union or had authorized the check-off of their union dues, the union had failed to appoint a steward until the employer had complained, there was little union grievance activity, there was a high rate of turnover in the unit, and the steward had expressed reservations about the union's strength. Similarly in *Ingress-Plastene,* this court found sufficient evidence in the facts that only 49 of 156 employees belonged to the union or authorized the check-off of their dues, the union had written a letter to the employers that "urgently solicited" membership, the union had ignored the right to recommend certain employees for promotion, the union was four months late in appointing its safety committee and was lax in appointing 12 employees to positions of seniority, and there had been significant turnover in the unit. It is also significant that in *Ingress-Plastene,* as in the present case, the Board never affirmatively asserted that the Union did, in fact, have a majority status. It is also significant to note that there is no allegation that the Hospital engaged in any unfair labor practice other than its failure to bargain.

To hold that the Hospital had no basis on which to justify a good faith doubt in the present case would place the Hospital and other employers in an extremely difficult position. On one hand, the evidence might not be held to amount to adequate support for a good faith doubt; on the other hand, it might be an unfair labor practice for the employer to bargain with a minority union in light of the cumulative evidence indicating a loss of the Union's majority status, and yet it might also be an unfair labor practice for the employer to interview the employees regarding their preferences. We refuse, on the present record, to place this burden on the Hospital. Little or no evidence, and certainly no substantial evi-

**3.** *See also NLRB v. Wasson & Co.,* 422 F.2d 558 (7th Cir. 1970); *Viking Lithographers, Inc.,* 184 NLRB 139 (1970); *Lloyd McKee Motors, Inc.,*

170 NLRB 1278 (1968); *Hayworth Roll & Plate Co.,* 130 NLRB 604 (1961).

dence, supports the ALJ's and Board's conclusion that the Union was suffering only "temporary impairments."

One further point deserves consideration. During the hearing before the ALJ in this matter, the Hospital was not allowed to introduce into evidence the Union's membership list which the Hospital obtained after April 31 and during discovery in this litigation. The ALJ held that because membership is not necessarily correlative with Union support, the list was inadmissible. This was clearly improper. Though low membership might not be indicative always of little union support, the low membership is clearly probatively relevant to the issue's determination. Similarly, the claim that the list, because it was not obtained by the Hospital until after it had withdrawn recognition, could not have been relied upon by the Hospital, is inapposite. Admissibility is not determined solely by what evidence the employer could have relied upon in making his or her decision to withdraw recognition. The list, although obtained after the decision, would still seem useful to shed light on the reasonableness of the Hospital's claims regarding the relevant time. If the employer claims it believed the Union was not supported by a majority of the employees, a list later transmitted indicating that at the time of the decision the Union did not, in fact, have a majority of the employees as members would be probatively relevant, irrespective of the weight that it might be given under the factual circumstances of a particular case.

For the reasons set out herein, the petition for review is granted and the cross-application for enforcement of the Board's order is denied.

ENFORCEMENT DENIED.