900 F.2d 250
 133 L.R.R.M. (BNA) 3048
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
COLONNA'S SHIPYARD, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD; United Industrial
Workers--Seafarers International Union of North
America, Respondents.
 No. 89-1712.
 United States Court of Appeals, Fourth Circuit.
 Argued: Jan. 11, 1990.
Decided: April 3, 1990.
Rehearing and Rehearing In Banc Denied April 30, 1990.
 
 On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
 Robert G. Riegel, Jr., Coffman, Coleman, Andrews & Grogan, Jacksonville, Fla. for petitioner; William H. Andrews, Coffman, Coleman, Andrews & Grogan, Jacksonville, Fla., on brief.
 Paul Jay Spielberg, Deputy Assistant General Counsel, National Labor Relations Board, Washington, D.C., for respondents; Joseph E. Desio, Acting General Counsel, Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Christopher Warren Young, National Labor Relations Board, Washington, D.C., on brief.
 NLRB
 ORDER ENFORCED.
 Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, and K.K. HALL and WILKINS, Circuit Judges.
 PER CURIAM:
 
 
 1
 This case is before us on Colonna's Shipyard, Inc.'s ("the Company") petition for review of the National Labor Relations Board's order of March 8, 1989, and on the Board's cross-application for enforcement. For the reasons set forth below, we grant the cross-application for enforcement of the order.
 
 
 2
 * Colonna's Shipyard is a full-service shipyard repair facility located in Norfolk, Virginia. In 1963 the Company voluntarily recognized the United Industrial Workers Union ("Union") and for 23 years maintained a bargaining relationship with the Union. In January 1985, prior to the expiration of the most recent three-year contract, the parties began negotiating for a new contract. After they reached an impasse in the bargaining, the Union submitted the Company's final proposal to Union members at a meeting held on March 8, 1985. Between 30 and 50 members attended the meeting; a majority voted to reject the Company's proposal. At that time there were 207 members in the bargaining unit.
 
 
 3
 The Union then obtained a list of employees and their addresses from the Company and resubmitted the proposal to its members by a mail ballot on March 28. The employees were instructed to seal and mail their ballots to the Union's post office box by April 11, 1985.[1] Before the ballots were due, a petition to remove the Union began to circulate at the Company yard. On April 4, Bernard Chitty, the company employee who had been circulating the petition, filed with the Board's regional office in Richmond a formal decertification petition supported by signatures he had collected.
 
 
 4
 The last round of negotiations took place in mid-March 1985. Prior to the negotiations, Ardell Wright, a member of the Union negotiating committee, resigned from the committee. She also resigned her position as the senior shop steward and was not replaced. On June 20, 1985, the Company notified the Union that it was implementing its last proposal affecting group health insurance and pension benefits. Although the Union warned the Company in writing that it should not make any unilateral changes in benefits, the changes were implemented on July 1. In the fall of 1985, the Company began making a number of other unilateral changes.
 
 
 5
 The Union held several meetings during the summer and fall of 1985 while the decertification petition was pending. Overall, the meetings were poorly attended. Beginning in April 1985 and continuing into 1986, the Union made approximately 200 house calls to Company employees and delivered copies of the monthly newspaper of the Union's International. The Union also began publishing a periodic newsletter and distributing it to Company employees. Several times during the spring and summer of 1985, the Union distributed handbills to employees as they entered or left the plant urging them to join the Union. The Company laid off a number of employees from the bargaining unit during the summer of 1985. On September 4, the Union asked for a list of those employees. Although the Company supplied the list, it questioned the majority status of the Union at the time and its authority to make the request.
 
 
 6
 On January 24, 1986, the Regional Director dismissed the decertification petition filed by Bernard Chitty because Chitty was found to be a supervisor within the meaning of Sec. 2(11) of the National Labor Relations Act. After the Chitty petition was dismissed, bargaining unit members Richard Keffer and Jack Jones approached Thomas Godfrey, Director of Finance and Administration at the Company, and told him they knew the petition had been dismissed and that they felt an overwhelming number of employees wanted to get rid of the Union and asked what could be done. Sometime after this conversation Keffer started a second decertification petition and filed that petition with the Board on March 19, 1986.
 
 
 7
 On February 24, 1986, the Company officially withdrew recognition of the Union by denying access to Company property to Union officials in contravention of the expired collective bargaining agreement. The Company's security officer informed a Union official that he was not permitted on the property because the Company believed that the Union had lost its majority status. On February 26, the Union requested that the Company supply the name, address, date of hire, class and current wage rate of each current unit employee. The Company refused to supply the information. On March 26, Supervisor Al Denson told pipe shop employees at the Company that the Union was no longer their representative.
 
 
 8
 These acts were the bases of charges subsequently filed by the Union against the Company with the Board. Pursuant to the charges, an amended complaint was issued by the Regional Director on July 11, 1986. The complaint alleged that the Company committed unfair labor practices by unilaterally denying the Union access to its facility, by refusing to furnish requested information to the Union, and by telling employees they were not represented by a Union.
 
 
 9
 On September 24 and 25, 1986, a hearing before an administrative law judge ("ALJ") was held. In a February 6, 1987, order the ALJ found that the Company did not have a reasonable doubt based on objective considerations that a majority of the unit employees wanted to be represented by the Union. Therefore, the Company had violated Secs. 8(a)(5) and (1) of the National Labor Relations Act by failing to furnish the requested information to the Union and by denying access to its premises to Union representatives and had violated Sec. 8(a)(1) of the Act by telling employees that they were not represented by a Union. The ALJ ordered the Company to cease and desist from the unfair labor practices and from interfering with employees in the exercise of their rights under Sec. 7 of the Act. The ALJ also ordered the Company to furnish the Union with the information requested in February 1986, to notify the Union that the Company's premises had been restored for its use, and to post an appropriate notice at its Norfolk facility.
 
 
 10
 The Company filed exceptions to this order with the Board and the Board subsequently remanded the case to the ALJ "for the limited purpose of reopening the record to receive evidence on the Respondent's responsibility for supervisor Chitty's anti-union petition under the test of Montgomery Ward."[2]
 
 
 11
 A supplemental hearing was held on December 1 and 2, 1987, and on February 24, 1988, the ALJ issued a supplemental decision in which he ruled that the Company was responsible for Chitty's actions in circulating the decertification petition and could not rely on the signatures secured by Chitty as a basis for withdrawing recognition. Absent the invalid petition, the ALJ found that the Company's withdrawal of recognition was not based on sufficient objective evidence to support a reasonable doubt of the Union's continuing majority status and, therefore, was not a valid defense to the charges that the Company had violated the Act. The Company filed exceptions to the supplemental decision. The Board considered the exceptions and in an order dated March 8, 1989, adopted the ALJ's rulings with slight modifications. The Company filed the instant action seeking review of the Board's decision. The Board has filed a cross-application for enforcement of the order.
 
 II
 
 12
 The basic rule with regard to a union's majority status is that upon expiration of a union's original certification year, a rebuttable presumption of representative status exists. Terrell Machine Company v. NLRB, 427 F.2d 1088, 1090 (4th Cir.), cert. denied, 398 U.S. 929 (1970). The employer may overcome the presumption by showing that its refusal to bargain was predicated "upon a reasonably grounded good faith doubt of majority support." Id. The Board concluded that the Company's withdrawal of recognition in this case was not based on sufficient objective evidence to support a reasonable doubt of the Union's continuing majority status. The Company contends otherwise.
 
 
 13
 The employer's burden is to establish that it had a reasonable, bona fide belief that the union no longer represented a majority of the bargaining unit employees. Bickerstaff Clay Products Co. v. NLRB, 871 F.2d 980 (11th Cir.1989). The test for determining whether the employer had a "reasonably grounded good faith doubt" of majority support is an objective one. Bellwood General Hospital, Inc. v. NLRB, 627 F.2d 98, 102 (7th Cir.1980); NLRB v. Tahoe Nugget, Inc., 584 F.2d 293, 299 (9th Cir.1978), cert. denied, 442 U.S. 921 (1979). Whether an employer has such objective evidence is a question of fact and the Board's resolution should be upheld if supported by substantial evidence. Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951); NLRB v. Tahoe Nugget, Inc., 584 F.2d at 297.
 
 
 14
 A thorough review of the record in this case convinces us that there is substantial evidence to support the Board's conclusion that the Company did not have a good faith doubt of continued majority support. Since the Company could not rely on the Chitty petition, we must look elsewhere for evidence to support a good faith doubt as to the Union's majority status. General employee disaffection with the Union is not an objective basis for the Company's doubt. Although there was evidence that unidentified foremen advised Thomas Godfrey that employees wanted to vote on the Union's majority status and resented the Union's continued claim of representation, Godfrey was not given the names of the dissatisfied employees. Neither was he given any concrete evidence to substantiate Keffer and Jones' opinion that they felt that an overwhelming number of employees wanted to get rid of the Union. These opinions, without more, are merely speculation and are not objective evidence.
 
 
 15
 The Company also relies on the fact that only a small number of members attended Union meetings and that fifteen members cancelled their Union membership or cancelled their check-off authorizations. Neither of these is the equivalent of showing lack of union support. To the contrary was evidence that the Company on at least two separate occasions rejected the Union's request to arbitrate employee grievances, the Union held several meetings during the summer of 1985 while the Chitty decertification petition was pending, and during this period the Union actively recruited members and distributed Union literature to Company employees. Further, when a number of employees were laid off in the summer of 1985, the Union requested a list of those employees from the Company.
 
 
 16
 Relying on Celanese Corp. of America, 95 N.L.R.B. 664 (1951), the Company argues that the administrative law judge erred in considering each of the factors upon which the Company relied in withdrawing recognition separately, when he should have looked at the totality of all the circumstances and considered the cumulative effect of such factors to decide if the Company had a reasonably grounded good faith doubt of the Union's loss of majority status. In Celanese the Board held that:
 
 
 17
 By its very nature, the issue of whether an employer has questioned a union's majority status in good faith cannot be resolved by resort to any simple formula. It can only be answered in the light of the totality of the circumstances of a particular case.
 
 95 N.L.R.B. at 673.[3]
 
 18
 Although the ALJ did not explicitly speak of the totality of the circumstances, he did base his decision on "the record as a whole" and implicit in his conclusion is his consideration of the cumulative effect of the factors relied upon by the Company in withdrawing recognition. We, therefore, affirm the finding that there was not sufficient objective evidence before the Company on which to base a reasonable doubt of the Union's continued majority support.
 
 III
 
 19
 The Company also contends that the ALJ erred in refusing to admit into evidence the decertification petition filed by Richard Keffer, showing a majority of employees favoring the ouster of the Union. The Keffer petition was filed in March of 1986. The Company first withdrew recognition of the Union on February 24, 1986. The ALJ declined to consider the petition on the ground that it was irrelevant because it was made after the Company withdrew recognition. We find the ALJ quite properly refused consideration.
 
 
 20
 An employer must be able to justify its claim of a good faith doubt at the time of withdrawal of recognition. Terrell Machine Company v. NLRB, 427 F.2d 1088, 1090 (4th Cir.), cert. denied, 398 U.S. 929 (1970). See also NLRB v. Fall River Dyeing & Finishing Corp., 775 F.2d 425 (1st Cir.1985); Nazareth Regional High School v. NLRB, 549 F.2d 873, 880 (2d Cir.1977); NLRB v. Gulfmont Hotel Co., 362 F.2d 588, 589 (5th Cir.1966). As the court held in Fall River Dyeing & Finishing Corp., no useful purpose is served by permitting the employer to defend against an earlier withdrawal of recognition by relying on subsequent events that had nothing to do with the withdrawal. 775 F.2d at 433. Thus, we conclude that the ALJ did not err in refusing to consider the Keffer petition as evidence of the Company's good faith doubt of the Union's majority status on February 24, 1986.
 
 IV
 
 21
 Having found that substantial evidence supports the Board's order and that the Board did not err in declining to consider the Keffer decertification petition, we determine that the Board's order should be enforced. Accordingly, the Board's order of March 8, 1989, is ENFORCED.
 
 
 
 [1]
 In November 1985, the Company was contacted by the United States Postal Service and informed that the Union's post office box designated for collection of ballots had been closed for non-payment. The Company forwarded the ballots received from the Postal Service to the Union, but was never informed of the results
 
 
 [2]
 The National Labor Relations Act proscribes an employer or its agents from soliciting employee support for an anti-union petition. The test for determining whether an employer is responsible for the conduct of an employee in circulating a petition was set out in Montgomery Ward & Co., 115 N.L.R.B. 645 (1956), where the Board held that it generally will refuse to hold an employer responsible for the anti-union conduct of a supervisor circulating a petition absent evidence that the employer encouraged, authorized, or ratified the supervisor's activities or acted in such a manner as to lead the employees reasonably to believe that the supervisor was acting on behalf of management
 
 
 [3]
 Several courts have found that it is the cumulative effect of all the evidence presented to the employer which is the relevant consideration, not each element considered separately. See e.g., Bellwood General Hospital v. NLRB, 627 F.2d 98 (7th Cir.1980)